1 | ALEXANDER G. CALFO (SBN 152891)
*ACalfo@yukelaw.com*
2 | KELLEY S. OLAH (SBN 245180)
*KOlah@yukelaw.com*
3 | YUKEVICH CALFO & CAVANAUGH
355 S. Grand Avenue, 15th Floor
4 | Los Angeles, CA 90071-1560
Telephone: (213) 362-7777
5 | Facsimile: (213) 362-7788

6 | Attorneys for Defendant
DEPUY ORTHOPAEDICS, INC.

7

8

9 | UNITED STATES DISTRICT COURT

10 | NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

11

12 | MARY LYSTER and GORDON LYSTER, | CASE NO. **CV 11 1736**

13 | Plaintiffs, | **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. SECTION 1441(b)**

14 | vs. | **(DIVERSITY)**

15 | DEPUY ORTHOPAEDICS, INC., | JURY TRIAL DEMANDED
THOMAS P. SCHMALZRIED, M.D.
16 | A PROFESSIONAL CORPORATION,
and DOES 1 through 20, inclusive
17

18 | Defendants.

19

20 | **NOTICE OF REMOVAL**

21 |     Defendant DePuy Orthopaedics, Inc. ("DePuy"), through undersigned counsel, hereby

22 | removes the state-court action entitled *Mary Lyster v. DePuy Orthopaedics, Inc. et al.*, Civil

23 | Action No. 11-00570, filed in the Superior Court of California, County of Contra Costa. Removal

24 | is warranted under 28 U.S.C. § 1441(b) because this is a diversity action over which this Court has

25 | original jurisdiction under 28 U.S.C. § 1332.

26 | / / /

27 | / / /

28 | / / /

535229.1 / 25-054

1    In support of removal, DePuy states as follows:

2        1.      On or about March 9, 2011, plaintiffs commenced this action against DePuy, Dr.

3   Thomas Schmalzried and un-named Doe defendants by filing a complaint in the Superior Court of

4   Contra Costa County, in the State of California, bearing case number 11-00570.

5        2.      In this action, plaintiffs allege that Mrs. Lyster suffered various injuries as a result

6   of being implanted with a Pinnacle Acetabular Cup System ("Pinnacle ACS") manufactured and

7   sold by DePuy. (Compl. ¶¶ 34-43.)  Plaintiffs' key contention is that DePuy continued selling the

8   Pinnacle ACS after it was aware of alleged problems with the system.  (*Id.* ¶¶ 29-31.)

9        3.      This is one of a number of similar cases pending around the country.  A plaintiff in

10  a case pending in the Central District of California has moved the Judicial Panel on Multidistrict

11  Litigation for creation of a multidistrict litigation ("MDL") proceeding for all Pinnacle ACS cases,

12  and DePuy intends to support the request for creation of an MDL proceeding.

13       4.      As set forth more fully below, this case is properly removed to this Court pursuant

14  to 28 U.S.C. § 1441 because this Court has subject-matter jurisdiction over this action pursuant to

15  28 U.S.C. § 1332, and DePuy has satisfied the procedural requirements for removal.

16  **I.    REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT-MATTER**

17       **JURISDICTION PURSUANT TO 28. U.S.C. §§ 1332 and 1441.**

18       5.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1441

19  because this is a civil action in which the amount in controversy exceeds the sum of $75,000,

20  exclusive of costs and interest, and is between citizens of different States.

21       **A.    Complete Diversity Of Citizenship**

22       6.      Plaintiffs are citizens of the State of California. (Compl. ¶¶ 2, 3.)

23       7.      DePuy is, and was at the time plaintiffs commenced this action, a corporation

24  organized under the laws of the State of Indiana with its principal place of business in Warsaw,

25  Indiana, and, therefore, is a citizen of the State of Indiana for purposes of determining diversity.

26  28 U.S.C. § 1332(c)(1).

27       8.      Dr. Schmalzried is a citizen of the State of California. (Compl. ¶ 5.)

28       9.      Plaintiffs also name numerous "Doe" defendants whose citizenship is disregarded

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1  for purposes of removal. 28 U.S.C. § 1441(a).

2       10.    Thus, plaintiffs are diverse from all the defendants except Dr. Schmalzried.

3       11.    Dr. Schmalzried's presence in the case does not defeat diversity jurisdiction,

4  however, because he was fraudulently joined. Under the fraudulent-joinder doctrine, a court

5  should disregard the citizenship of a defendant where, as here, there is "no possibility that the

6  plaintiff will be able to establish a cause of action in state court against the alleged sham

7  defendant." *Taylor v. Jeppesen DataPlan, Inc.*, No. C 10-1920 SBA, 2010 U.S. Dist. LEXIS

8  106160, at *5 (N.D. Cal. Sept. 27, 2010) (internal quotation marks and citation omitted); *see also*

9  *McCabe v. Gen. Foods Corp.*, 811 F.2d 1336, 1339 (9th Cir. 1987). A defendant is fraudulently

10  joined and the defendant's presence in the lawsuit is ignored for purposes of determining the

11  propriety of removal where no viable cause of action has been stated against the resident

12  defendant. *See Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001); *TPS*

13  *Utilicom Servs., Inc. v. AT&T Corp.*, 223 F. Supp. 2d 1089, 1100 (C.D. Cal. 2002); *United*

14  *Computer Sys., Inc. v. AT & T Corp.*, 298 F.3d 756, 761 (9th Cir. 2002).

15       12.    That is precisely the case here. Although plaintiffs allege strict liability, negligence

16  and loss-of-consortium claims against Dr. Schmalzried,[1] there is no possibility that any of these

17  claims would succeed.

                  **(1)**    **There Is No Possibility That Liability Would Be Imposed**
18                                **On Dr. Schmalzried.**

19

20       13.    There is "no possibility that the plaintiff[s] will be able to establish [their] cause[s]

21  of action in state court against" Dr. Schmalzried. *Taylor*, 2010 U.S. Dist. LEXIS 106160, at *5.

22       14.    ***First***, no California court would impose strict liability on Dr. Schmalzried.

23  Although California allows application of strict-liability theories to participants outside the chain

24  of distribution, the circumstances under which such liability is permitted are extremely narrow. In

25  *Bay Summit Community Association v. Shell Oil Co.*, the court articulated a three-part test for

26  strict-liability claims against a non-manufacturing, non-distributing defendant:

27  [1]    Plaintiffs also assert warranty claims, but not against Dr. Schmalzried. (Compl. ¶¶ 59-69.)

28

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

> (1) the defendant received a direct financial benefit from its activities and from the sale of the product; (2) the defendant's role was integral to the business enterprise such that the defendant's conduct was a necessary factor in bringing the product to the initial consumer market; and (3) the defendant had control over, or a substantial ability to influence, the manufacturing or distribution process.

51 Cal. App. 4th 762, 776 (Cal. Ct. App. 1996). The court went on to explain that the fact that "an entity was a link in the chain of getting goods to the market or that it participat[ed] in marketing a defective product is not enough to establish the defendant should be held strictly liable." *Id.* at 778 (internal quotation marks and citation omitted). After all, and as other California courts have held, "[t]here is, implicit in the strict liability standard, a requirement that the defendant have some ability to control the manufacturing or distribution of the product." *Bruce v. Clark Equip. Co.*, No. Civ. S-05-01766 WBS KJM, 2007 U.S. Dist. LEXIS 25331, at *11 (E.D. Cal. Mar. 26, 2007); *Hanberry v. Hearst Corp.*, 276 Cal. App. 2d 680, 687-88 (Cal. Ct. App. 1969) (holding that strict liability "should not be extended . . . to a general endorser" that was not "involved in manufacturing products for, or supplying products to, the consuming public").

15. Here, plaintiffs have not alleged that Dr. Schmalzried controlled, or had any ability to control, the manufacturing or distribution of the product. Plaintiffs only allege that Dr. Schmalzried designed "components" for the Pinnacle ACS, was "involved in promoting and marketing" the Pinnacle ACS, and then "collect[ed] royalties" in return. (Compl. ¶ 5.) On the other hand, plaintiffs' allegations regarding DePuy demonstrate that all control over manufacturing and distributing was vested in it. Plaintiffs specifically allege that "DePuy sold the Pinnacle Hip to Mary Lyster" even though "DePuy had received more than 600 complaints" about the Pinnacle ACS by the time of the sale, making "DePuy . . . fully aware that the Pinnacle Hip was defective." (*Id.* ¶ 30.) Plaintiffs go on to state that even though DePuy had this information, DePuy did not recall and did not stop selling the Pinnacle ACS. (*See id.*)[2]

---

[2] Plaintiffs' design-defect strict-liability claim against Dr. Schmalzried fails for another reason as well. Under California law, "the entire category of medical implants available only by resort to the services of a physician are immune from design defect strict liability." *Artiglio v. Superior* (footnote continued)

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1    16.    **Second**, plaintiffs' claim for negligence against Dr. Schmalzried is utterly without

2  merit because plaintiffs cannot establish that Dr. Schmalzried owed any independent duty to them.

3  Plaintiffs assert that "defendants" failed to "exercise ordinary care in the design, manufacture,

4  testing, inspection, labeling, and sale of the DePuy Pinnacle" ACS and also "maliciously,

5  recklessly and/or negligently failed to exercise their duty to exercise reasonable care in the

6  provision of an adequate warning to Mrs. Lyster and her physicians." (*Id.* ¶¶ 54, 56.)  But no duty

7  arises from "being the developer, inventor, or patent holder of a product or design." *Murphy v.*

8  *Aventis Pasteur, Inc.*, 270 F. Supp. 2d 1368, 1376-77 (N.D. Ga. 2003).  Otherwise, every

9  individual who had any role in the design of any component of any product, such as a vehicle,

10 would potentially be liable for negligence any time an individual was injured using it.  Such an

11 approach would result in limitless liability for millions of Americans who work in any capacity in

12 which they provide input into the design or manufacturing of any products.  Accordingly, our legal

13 system limits liability to the actual manufacturer of a product, which has a duty of care to those

14 who buy its products.  *See Morrow v. Wyeth*, No. B-05-209, 2005 U.S. Dist. LEXIS 43194, at

15 *13-14 (S.D. Tex. Oct. 13, 2005) (noting that the law places liability on the manufacturer of an

16 allegedly defective product, not on the specific individuals involved in the design and manufacture

17 of the product).[3]  For this reason too, Dr. Schmalzried is fraudulently joined.

18

---

19 *Court*, 22 Cal. App. 4th 1388, 1397 (Cal. Ct. App. 1994); *see also Hufft v. Horowitz*, 4 Cal. App.

20 4th 8, 19 (Cal. Ct. App. 1992) ("As with prescription drugs, the harsher rule of strict liability may
discourage manufacturers from researching and marketing new medical devices due to realistic

21 fear of substantial adverse judgments, the high cost of strict liability insurance and the uncertainty
that such insurance will even be available. . . .  Public interest is served, rather than thwarted, by

22 relieving the manufacturer of strict liability for injuries resulting from implanted medical devices
that have been properly fabricated and marketed.").  There is no contention anywhere in plaintiffs'

23 complaint that Mrs. Lyster's Pinnacle ACS was obtained other than by the services of a physician.

24 For this reason too, plaintiffs' design-defect strict-liability claim against Dr. Schmalzried is
doomed to fail.

25 [3]    Moreover, negligence claims like plaintiffs' that are based on an alleged failure to warn

26 cannot succeed against a defendant like Dr. Schmalzried because he had no duty to warn plaintiffs
under California's "learned intermediary" doctrine.  *See Carlin v. Superior Court*, 13 Cal. 4th

27 1104, 1116 (1996); *Brown v. Superior Court*, 44 Cal. 3d 1049, 1061-1062, n.9 (1988) (under the
"learned intermediary" doctrine, the duty to warn about a medical device's risks runs from the

28 (footnote continued)

1    17.   **Third**, plaintiff Gordon Lyster's claim for loss of consortium fails.  California law

2 is clear that where a plaintiff "has no cause of action in tort[,] [the] spouse has no cause of action

3 for loss of consortium." *Blain v. Doctor's Co.*, 222 Cal. App. 3d 1048, 1067 (Cal. Ct. App. 1990)

4 (dismissing loss-of-consortium claim because none of the intelligible claims of the first amended

5 complaint stated a cause of action); *Malone v. Marriott Int'l, Inc.*, No. EDVC 09-01980, 2010

6 U.S. Dist. LEXIS 116666, at *17 (C.D. Cal. Oct. 29, 2010) ("As Defendants are not liable for the

7 underlying tort to Mrs. Malone, Mr. Malone may not recover on his loss of consortium claim.").

8 As set forth above, plaintiffs have no possibility of prevailing on their strict liability and

9 negligence causes of action against Dr. Schmalzried.  Thus, Mr. Lyster's claim for loss of

10 consortium must also fail as a matter of law.

11    18.   For all of these reasons, there is no possibility that a California court would rule

12 against Dr. Schmalzried on any of plaintiffs' claims, and he is therefore fraudulently joined.

> **(2)   Plaintiffs' Allegations Against Dr. Schmalzried Are Utterly Bereft Of Fact, Further Demonstrating That He Was Fraudulently Joined.**

15    19.   Even if liability were theoretically possible, plaintiffs' allegations against Dr.

16 Schmalzried contain no factual color, further evidencing that he was fraudulently joined.

17    20.   Plaintiffs make only broad, collective and conclusory claims against a group

18 generically described as "defendants" and lump Dr. Schmalzried together with DePuy in those

19 allegations. *(See* Compl. ¶¶ 34, 37, 42, 45.)  Court after court has found that such vague and

20 conclusory assertions against in-state defendants (and non-diverse defendants) cannot defeat

21 diversity jurisdiction. *See, e.g., Shah v. Wyeth Pharms., Inc.*, No. CV 04-8652 DT (MANx), slip

22 op. at 7 (C.D. Cal. Jan. 18, 2005) (attached as Ex. 1) ("[A]llegations against 'defendants'

23 collectively are insufficient to warrant remand, especially when Plaintiffs fail to allege any

24 'particular or specific activity' on the part of each of the non-diverse defendants) (citing *Badon v.*

27 manufacturer to the physician (the "learned intermediary"), and then from the physician to the patient).

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1 | *RJR Nabisco, Inc.*, 224 F.3d 382, 391-92 (5th Cir. 2000)); *In re Phenylpropanolamine (PPA)*

2 | *Prod. Liab. Litig.*, MDL No. 1407, No. C02-423R, slip op. at 5 (W.D. Wash. Nov. 27, 2002)

3 | (denying remand in case involving local pharmacy; allegations directed toward "defendants" or

4 | "all defendants" could not reasonably be interpreted to include the store) (attached as Ex. 2));

5 | *Bennett v. Allstate Ins. Co.*, 753 F. Supp. 299, 301 (N.D. Cal. 1990) (denying motion to remand

6 | because, *inter alia*, plaintiff's complaint made "no attempt" to "differentiate between the conduct"

7 | of the defendants); *TPS Utilicom Servs., Inc. v. AT&T Corp.*, 223 F. Supp. 2d 1089, 1103-1104

8 | (C.D. Cal. 2002) (plaintiff's claims against the resident defendants were "wholly inadequate"

9 | because the plaintiff failed to allege "any conduct on the part of the resident defendants" in

10 | relation to the transaction at issue; noting that plaintiff could not "resist the fraudulent joinder

11 | analysis by arguing that future discovery might turn up a factual basis for [the claims]"); *Brown v.*

12 | *Allstate Ins. Co.*, 17 F. Supp. 2d 1134, 1137 (S.D. Cal. 1998) (finding in-state defendants

13 | fraudulently joined where the complaint did not allege any wrongdoing or make any material

14 | allegations against the defendants); *In re Diet Drugs (Phentermine, Fenfluramine,*

15 | *Dexfenfluramine) Prods. Liab. Litig.*, 220 F. Supp. 2d 414, 424 (E.D. Pa. 2002) (finding

16 | fraudulent joinder of non-manufacturer defendants where complaints were "filled . . . with general

17 | statements levied against all defendants, which most properly can be read as stating claims against

18 | the drug manufacturers"). As one court put it: there is "no better admission of fraudulent joinder

19 | of [the resident defendants]" than the failure of the plaintiff "to set forth any specific factual

20 | allegations" against them. *Lyons v. Am. Tobacco Co.*, No. Civ. A. 96-0881-BH-S, 1997 WL

21 | 809677, at *5 (S.D. Ala. Sept. 30, 1997).

22 |      21.    For this reason too, Dr. Schmalzried is fraudulently joined, and his citizenship must

23 | be disregarded for jurisdictional purposes.

24 | **B.**    **Amount In Controversy**

25 |      22.    Plaintiffs in this action claim that Mrs. Lyster has suffered "severe and possibly

26 | permanent injuries, pain suffering and emotional distress." (Compl. ¶ 42.) Plaintiffs seek past and

27 | future medical expenses, past and future general damages, past and future loss of earnings and

28 | punitive damages. (*See id.*, Prayer For Relief.)

YUKEVICH CALFO & CAVANAUGH<br>355 S. GRAND AVENUE, 15TH FLOOR<br>LOS ANGELES, CALIFORNIA 90071-1560<br>TELEPHONE (213) 362-7777<br>FACSIMILE (213) 362-7788

1    23.    It is widely recognized that personal-injury claims facially meet the $75,000

2  jurisdictional threshold. *See, e.g.*, *In re Rezulin Prods. Liab. Litig.*, 133 F. Supp. 2d 272, 296

3  (S.D.N.Y. 2001) (finding that a complaint alleging various injuries from taking a prescription drug

4  "obviously asserts a claim exceeding $75,000"). In addition, compensatory and punitive damages

5  in excess of the jurisdictional amount of $75,000 have been awarded in product-liability cases in

6  California. *See, e.g.*, *Stewart v. Union Carbide Corp.*, 117 Cal. Rptr. 3d 791 (Cal. Ct. App. 2010);

7  *Karlsson v. Ford Motor Co.*, 45 Cal. Rptr. 3d 265 (Cal. Ct. App. 2006); *Jones v. John Crane, Inc.*,

8  35 Cal. Rptr. 3d 144 (Cal. Ct. App. 2005).

9    24.    Other federal courts have similarly concluded that the amount in controversy

10  exceeded $75,000 in pharmaceutical cases. *See, e.g.*, *Smith v. Wyeth, Inc.*, 488 F. Supp. 2d 625,

11  630-31 (W.D. Ky. 2007) (denying motion to remand); *Copley v. Wyeth, Inc.*, No. 09-722, 2009

12  WL 1089663 (E.D. Pa. Apr. 22, 2009) (same).

13    25.    Given plaintiffs' claim that Mrs. Lyster has suffered "severe and possibly

14  permanent injuries," as well as pain and suffering, and that they will suffer additional damages in

15  the future, it is evident that the amount of recovery sought by plaintiffs exceeds $75,000.

16    26.    Thus, on the face of the Complaint, the finder of fact could easily conclude that

17  plaintiffs are entitled to damages in excess of $75,000.

18  **II.    DEPUY HAS SATISFIED THE PROCEDURAL REQUIREMENTS FOR**

19  **REMOVAL.**

20    27.    Defendant DePuy was served with plaintiffs' Complaint on March 14, 2011.

21  Accordingly, this Notice of Removal is timely filed pursuant to 28 U.S.C. § 1446(b).

22    28.    The Superior Court of Contra Costa County is located within the San Francisco

23  Division of the Northern District of California. *See* 28 U.S.C. § 1441(a); L.R. 3-2(d), 3-5(b).

24    29.    DePuy is not a citizen of the State of California, the State where this action was

25  brought. *See* 28 U.S.C. § 1441(b).

26    30.    It is well settled that co-defendants who are fraudulently joined need not join in the

27  removal. *See Borsuk v. Mass. Mut. Life Ins. Co.*, No C 03-630 VRW, 2003 U.S. Dist. LEXIS

28  25259, at *7-8 (N.D. Cal. Sept. 4, 2003). As set forth above, Dr. Schmalzried is fraudulently

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1 joined. *See* Section I.A, above. Therefore, he need not consent to removal.

2     31.     Although removal is ordinarily improper where a "properly joined" defendant is a

3 "citizen of the State in which such action is brought," *see* 28 U.S.C. § 1441(b), Dr. Schmalzried's

4 citizenship should be ignored because he was fraudulently joined. *See* Section I.A, above.

5     32.     No previous application has been made for the relief requested herein.

6     33.     Pursuant to 28 U.S.C. § 1446(a), copies of all process, pleadings and orders served

7 upon DePuy, which papers include the complaint, are attached collectively as Exhibit 3. Pursuant

8 to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon counsel for

9 plaintiffs and a copy is being filed with the Clerk of the Superior Court of the County of Contra

10 Costa.

11     WHEREFORE, DePuy respectfully removes this action from the Superior Court of the

12 County of Contra Costa, in the State of California, bearing Number 11-00570, to this Court.

13 DATED: April 8, 2011             YUKEVICH CALFO & CAVANAUGH

14

15                 By:

16                       Alexander G. Calfo
                      Kelley S. Olah

17                       Attorneys for Defendant DEPUY
                      ORTHOPAEDICS, INC.

18

19

20

21

22

23

24

25

26

27

28

535229.1 / 25-054          9

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

# EXHIBIT 1

Case 2:04-cv-08652-DDP -MAN Document 20 Filed 01/18/05 Page 1 of 9 Page ID #:11

FILED
CLERK, U.S. DISTRICT COURT

JAN 1 8 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

SCANNER

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only



8    UNITED STATES DISTRICT COURT

9    CENTRAL DISTRICT OF CALIFORNIA

11   PUSHPA SHAH and BHANU SHAH,       )    CASE NO. CV 04-8652 DT (MANx)

                    Plaintiffs,        )    ORDER **DENYING** PLAINTIFFS'
13                                      )    MOTION TO REMAND ACTION TO
     vs.                               )    STATE COURT AND **DENYING**
14                                      )    **WITHOUT PREJUDICE**
15   WYETH PHARMACEUTICALS, INC.;      )    PLAINTIFFS' MOTION FOR LEAVE
     WYETH-AYERST                      )    TO FILE AMENDED COMPLAINT
16   PHARMACEUTICALS, INC.; WYETH-     )
     AYERST INTERNATIONAL, INC.;       )
17   WYETH LABORATORIES, INC.;         )
     WYETH PHARMACEUTICALS;            )
18   WYETH, INC.; PHARMACIA &          )
     UPJOHN, INC.; PFIZER, INC.; BARR  )
19   LABORATORIES, INC.;               )
     GREENSTONE LTD.; LINDA MILES;     )
20   STEVE DEGROOT; and DOES 1         )
     through 100, inclusive,           )
21                                      )
22                    Defendants.       )
23                                      )
24

25   I.   **Background**

26        This action, along with numerous other actions, arises out of injuries

27   and damages suffered by the plaintiffs as a result of the use of prescription drugs

28   to treat the effects of menopause. The drugs are commonly known and referred to

EXHIBIT 1 - PAGE 010

1  as Hormone Replacement Therapy ("HRT"). The defendants are: Wyeth, Wyeth

2  Pharmaceuticals Inc. and Wyeth-Ayerst International (collectively, "Wyeth

3  Defendants); Pfizer Inc.; Pharmacia & Upjohn, Inc.; Greenstone Ltd.; Barr

4  Laboratories, Inc.; Linda Miles; and Michael Record.[1]

5      **A.    Factual Summary**

6          This Court sets forth a brief summary of the allegations of the

7  Complaint as presented in Plaintiffs' current Motion:

8          HRT was introduced more than 50 years ago by Ayerst, the

9  predecessor of the Wyeth Defendants. It was touted as a safe, efficacious, and

10 therapeutic method to treat the effects of estrogen loss in menopausal and post-

11 menopausal women. The Wyeth Defendants vigorously marketed their HRT drugs

12 to induce physicians to prescribe the drugs. As part of the marketing campaign,

13 the Wyeth Defendants claimed benefits for the HRT drugs beyond those directly

14 associated with menopause and approved by the FDA. For example, the Wyeth

15 Defendants claimed that their HRT drugs could relieve tension, irritability,

16 headaches, fatigue, and insomnia caused by estrogen loss; that they could prevent

17 bone loss, heart disease, vision problems, tooth loss, Alzheimer's disease, and

18 colon cancer; that they could help moods and relieve skin dryness; and that they

19 promoted general well-being.

20         The Wyeth Defendants' marketing efforts were extremely successful.

21 For example, between 1990 and 1995, Premarin, an HRT drug manufactured by

22 the Wyeth Defendants, was the most frequently dispensed prescription drug in the

23 United States. In 2000, Premarin was the second most frequently prescribed drug

24 in the United States, with an approximately 46 million prescriptions, and it

25

26     [1] Steve Degroot was erroneously named as a defendant in the case caption.
27 Plaintiffs state that he is not a defendant in this case.

28                                    2

SCANNED

EXHIBIT 1 - PAGE 011

1    **B.    Procedural Summary**

2         On July 29, 2004, Plaintiffs filed the Complaint for Damages in the

3    Superior Court of the State of California for the County of Los Angeles ("Superior

4    Court").

5         On October 18, 2004, Defendants Pfizer, Inc., Pharmacia & Upjohn,

6    Inc. and Greenstone Ltd. filed an Answer to Complaint for Damages in the

7    Superior Court.

8         .    On October 19, 2004, Defendants Pfizer Inc., Pharmacia & Upjohn,

9    Inc. and Greenstone Ltd. (collectively, "Removing Defendants") filed a Notice of

10   Removal of Action. Upon removal, this action was assigned to Judge Hatter.

11        On November 1, 2004, an Order Re Transfer was issued, and this

12   action was assigned to this Court.

13        On November 18, 2004, Plaintiffs filed a Motion to Remand Action

14   to State Court or, in the Alternative, for Leave to File Amended Complaint, which

15   is currently before this Court.

16   **II.   Discussion**

17        **A.    Standard**

18        At any time prior to final judgment, the federal court may remand the

19   case to the state court for a defect in removal procedures or for lack of subject

20   matter jurisdiction. 28 U.S.C. § 1447(c). A plaintiff's motion for remand

21   effectively forces a defendant, the party who invoked the federal court's removal

22   jurisdiction, to prove whatever is necessary to support the petition, e.g., the

23   existence of diversity, the amount in controversy, or the federal nature of the

24   claim. See Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th Cir. 1992). In ruling on a

25   remand motion, this Court ordinarily determines removability from the complaint

26   as it existed at the time of the removal, together with the removal notice. Federal

27

28                                    4

SCANNED

**EXHIBIT 1 - PAGE 013**

1  to the settled rules of the state, the joinder of the resident defendant is fraudulent."

2  Id. (quoting McCabe v. General Foods Corp., 811 F.2d 1336, 1339 (9th Cir.

3  1987)). The question becomes, then, whether Plaintiffs state a cause of action

4  against the Individual Defendants.

5        Plaintiffs contend that the Complaint alleges two causes of action

6  against the Individual Defendants: the first cause of action for fraudulent

7  concealment and the seventh cause of action for loss of consortium. However,

8  Plaintiffs then state that "these causes of action can be amended to state valid

9  claims against the Individual Defendants based upon their intentional concealment

10  of the serious health risks associated with the HRT drugs they solicited, marketed,

11  and promoted to Plaintiff Pushpa Shah's physician, which he prescribed to and

12  were used by her and which caused her to suffer serious personal injuries,

13  including breast cancer." Plaintiffs essentially admit that the Complaint, as

14  currently pled, does not contain sufficient facts to state a claim for fraudulent

15  concealment or loss of consortium against the Individual Defendants.

16        Indeed, a review of the Complaint reveals that the only factual

17  allegation specifically directed to the Individual Defendants is:

18              Plaintiffs are informed and believe, and thereupon allege,

19              that at all times mentioned herein, Defendant Linda

20              Miles, Michael Record and DOES 1 through 50, were

21              and now are employees, servants or ostensible agent,

22              agents, of the Defendants, and each of them were

23              operating out of the County of Los Angeles, State of

24              California.

25  (Complaint, ¶ 4.) This bare factual allegation contained in the introduction of the

26  Complaint does not warrant remand. As Removing Defendants argue, Plaintiffs

27

28                                    6

EXHIBIT 1 - PAGE 015

1   do not allege any further facts against the Individual Defendants, such as which

2   manufacturer employed them or in what capacity, whether their conduct in any

3   way was related to HRT, whether they had any contact with Plaintiffs or their

4   prescribing physicians, or any facts concerning their conduct that supports their

5   individual liability.  Furthermore, allegations against "defendants" collectively are

6   insufficient to warrant remand, especially when Plaintiffs fail to allege any

7   "particular or specific activity" on the part of each of the non-diverse defendants.

8   Badon v. RJR Nabisco Inc., 224 F.3d 382, 391-92 (5th Cir. 2000).  As such, this

9   Court finds that Plaintiffs have failed to state any claim against the Individual

10  Defendants in the Complaint, and the Individual Defendants are therefore deemed

11  to be fraudulently joined.  Consequently, remand is not warranted as this Court

12  can properly exercise diversity subject matter jurisdiction.

13          **2.      Plaintiffs' motion for leave to amend the Complaint is**

14                  **denied without prejudice**

15          Realizing the deficiency, Plaintiffs alternatively request that the

16  denial be without prejudice and that they be granted leave under Federal Rule of

17  Civil Procedure 15(a) to file an amended complaint.  Plaintiffs argue that they can

18  amend the Complaint to state causes of action under California law for fraudulent

19  concealment and loss of consortium against the Individual Defendants.  As

20  explained below, this Court finds that any proposed amendment cannot be

21  considered with respect to the current Motion to remand, and a substantive

22  determination regarding Plaintiffs' Motion for leave to amend must be denied

23  without prejudice pending the transfer of this action to the United States District

24  Court for the Eastern District of Arkansas.

25          First, any proposed amendment by Plaintiffs cannot be considered to

26  support remand at this time.  Removing Defendants argue, and this Court agrees,

27

28                                          7

SCANNED

EXHIBIT 1 - PAGE 016

1 | courts are instructed to "strictly construe the removal statute against removal

2 | jurisdiction." Id.

3     **B.**    **Analysis**

4            The Removing Defendants removed this action on the basis of

5 | diversity subject matter jurisdiction. They allege that Plaintiffs are citizens of

6 | California and that the Removing Defendants and the other entity defendants are

7 | citizens of other states. They further allege that Defendants Linda Miles and

8 | Michael Record (collectively, "Individual Defendants") are fraudulently joined,

9 | and therefore, their citizenship must be disregarded in determining jurisdiction. In

10 | this Motion, Plaintiffs seek to remand this action to the Superior Court because of

11 | defects in the removal procedure and because of a lack of subject matter

12 | jurisdiction. More specifically, Plaintiffs argue that the Individual Defendants are

13 | not fraudulently joined to this action, that their citizenship cannot be disregarded,

14 | that the notice of Removal is defective because it fails to allege the citizenship of

15 | Defendant Linda Miles at the time this action was filed and at the time it was

16 | removed, and that the Removing Defendants cannot sustain their burden of

17 | proving that there was diversity of citizenship between Plaintiffs and the

18 | Individual Defendants at the times required by law.

19        **1.**     **Because the Complaint fails to state a claim against the**

20                 **Individual Defendants, the Individual Defendants were**

21                 **fraudulently joined**

22            In determining whether removal was proper based on diversity, the

23 | issue is whether the Individual Defendants were fraudulently joined. Fraudulently

24 | joined defendants will not defeat removal on diversity grounds. Ritchey v. Upjohn

25 | Drug Co., 139 F.3d 1313, 1318 (9th Cir. 1998). "If the plaintiff fails to state a

26 | cause of action against a resident defendant, and the failure is obvious according

27

28                                        5

EXHIBIT 1 - PAGE 014

1  generated more than 1 billion dollars in sales. It is estimated that in July 2002,

2  thirty-eight percent of post-menopausal women in the United States were using

3  some form of HRT and that approximately 6 million women were using Prempro,

4  another HRT drug manufactured by the Wyeth Defendants.

5  In or about the summer of 2002, medical studies conducted revealed

6  that prolonged use of HRT drugs, as advocated by the Wyeth Defendants,

7  substantially increases the risk of diseases and medical conditions, including

8  cardiovascular disease, breast cancer, ovarian cancer, stroke, heart attack, blood

9  clots, and pulmonary embolism. These findings were duplicated by several other

10  studies, and it was generally concluded that long-term HRT use can cause

11  grievous and life-threatening consequences.

12  Almost immediately after release of the findings, sales of HRT drugs

13  plummeted, and within one month, the Wyeth Defendants changed the warning

14  labels on their HRT drugs Premarin and Prempro to reflect the findings. Prior to

15  the change, there was nothing on the Premarin label about ovarian cancer, and the

16  Prempro warning label was drastically changed to address the increased risk of

17  breast cancer, pulmonary embolism, blood clots and cardiovascular disease.

18  In or about January 2003, the Wyeth Defendants abandoned their

19  long-standing marketing strategy of promoting long-term use of their HRT drugs.

20  In its place, they espoused a new and entirely contrary position: that these drugs

21  should be prescribed and used for the shortest period of time necessary. In a

22  newspaper advertisement placed in or about early June 2003, the Wyeth

23  Defendants acknowledged that "[h]ormone therapy is not a lifelong commitment,"

24  and they admitted that "hormone therapy should not be used to prevent heart

25  disease." They further acknowledged that use of HRT drugs can cause an

26  "increased risk of heart attack, stroke, breast cancer, blood clots and dementia."

27

28                                        3

EXHIBIT 1 - PAGE 012

1  that diversity jurisdiction is determined based on the complaint at the time of

2  removal, without reference to any subsequent amendments. The United States

3  Supreme Court has held that "the right to remove . . . [is] to be determined

4  according to the plaintiffs' pleading at the time of the petition for removal."

5  Pullman Co. v. Jenkins, 305 U.S. 534, 538, 59 S. Ct. 347 (1939). Applying this

6  rule of law, the Ninth Circuit affirmed the district court's denial of remand and

7  held that allegations contained in an amended complaint filed after removal are "of

8  no moment to us . . . for jurisdiction must be analyzed on the basis of pleadings

9  filed at the time of removal without reference to subsequent amendments." Sparta

10  Surgical Corp. v. Nat'l Association of Securities Dealers, Inc., 159 F.3d 1209,

11  1213 (9th Cir. 1998).[2] Applying these principles here, this Court must look to the

12  Complaint at the time of removal, and as explained above, the Complaint as pled

13

14

15        [2] This Court notes Defendants' reliance on Sparta for the proposition that
16  "any amendment would not support remand since 'plaintiff[s] may not compel
17  remand by amending a complaint.'" ( Opposition at 8 (quoting Sparta, 159 F.3d at
     1213).) As Plaintiffs argue, such reliance is misplaced. Unlike this case, which
18  involves removal based upon diversity jurisdiction, Sparta involved a removal
19  based upon federal question jurisdiction. In a case removed under federal question
     jurisdiction, so long as there was a federal claim at the time of removal, the court
20  may, in its discretion, continue to exercise jurisdiction over the case even though
21  the federal claim has subsequently been dismissed and only state law claims
     remain. The Court may also exercise its discretion to remand the case to state
22  court. See Harrell v. 20th Century Ins. Co., 934 F.2d 203, 205 (9th Cir. 1991).
23  Thus, while remand is discretionary following a post-removal amendment which
     eliminates the federal claim upon which the court's federal question jurisdiction
24  was based, remand is mandatory where a post-removal amendment eliminates the
25  court's diversity jurisdiction. "If at any time before final judgment it appears that
     the district court lacks subject matter jurisdiction, the case shall be remanded." 28
26  U.S.C. § 1447(c). Thus, upon determination by the appropriate Court regarding
27  the Motion to Amend, remand may be proper.

28                                          8

EXHIBIT 1 - PAGE 017

1  does not warrant remand. Furthermore, this Court cannot currently remand this
2  action based on future amendments Plaintiffs claim will be made.
3          The next issue, then, is whether leave to amend is warranted. In the
4  United States District Court for the Eastern District of Arkansas there is a
5  multidistrict litigation ("MDL") established by the Judicial Panel on Multidistrict
6  Litigation for the efficient handling of actions arising from the treatment with
7  HRT medication. In re Prempro Prod. Liab. Litig., 254 F. Supp. 2d 1366 (J.P.M.L.
8  2003). The Honorable William R. Wilson, Jr., United States District Judge for the
9  Eastern District of Arkansas, was designated the transferee judge by the Panel for
10  this MDL proceeding. On January 10, 2005, a Conditional Transfer Order
11  ("CTO") was filed by the Judicial Panel. The CTO states that this action, along
12  with other actions filed in this District related to the HRT drugs, is transferred to
13  the Eastern District of Arkansas and, with the consent of that Court, assigned to
14  the Honorable William R. Wilson, Jr. As such, because of the pending transfer of
15  this action, this Court finds it more prudent to allow the transferee court to decide
16  the issue of whether leave to amend is warranted. This Court therefore denies
17  Plaintiffs' Motion for Leave to File Amended Complaint without prejudice to
18  allow Plaintiffs to refile said Motion upon transfer to the MDL in the Eastern
19  District of Arkansas.

20  **III.  Conclusion**

21          Accordingly, this Court **denies Plaintiffs' Motion to Remand Action**
22  **to State Court** and **denies without prejudice Plaintiffs' Motion for Leave to File**
23  Amended Complaint.

24          IT IS SO ORDERED.
25  DATED:  1-18-05            **DICKRAN TEVRIZIAN**
26                             Dickran Tevrizian, Judge
                               United States District Court
27
28                          9

EXHIBIT 1 - PAGE 018

# EXHIBIT 2

FILED _____ ENTERED
LODGED _____ RECEIVED

NOV 27 2002

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY _____ DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE: PHENYLPROPANOLAMINE
(PPA) PRODUCTS LIABILITY
LITIGATION,                          MDL NO. 1407

_____      ORDER DENYING PLAINTIFF'S
                                     MOTION TO REMAND
This document relates to:

Barnett, et al. v. American
Home Products Corp., et al.,
(No. C02-423R)

THIS MATTER comes before the court on the motion of plain-
tiffs to remand the case to state court in Mississippi. Having
reviewed the papers filed in support of and in opposition to this
motion, the court rules as follows:

I.  BACKGROUND

Plaintiffs purchased a variety of over-the-counter drugs
including, but not limited to, products sold under the trade
names "Robitussin," "Alka-Seltzer Plus," "Dimetapp," "Tavist D,"
"BC," "Triaminic," "Contac," "Comtrex," and "Equate Tussin CF."
All of these products contained the ingredient phenylpro-
panolamine ("PPA"). The individuals later consumed the medica-
tion and suffered unidentified types of injuries. In June 2001,
plaintiffs filed an amended complaint in Mississippi state court
linking the PPA in the medicine with the injuries sustained.

ORDER
Page - 1 -

Exhibit E    43

M00324555

EXHIBIT 2 - PAGE 019

1     The complaint alleges numerous causes of action against both
2  manufacturers and distributors of PPA-containing products, as
3  well as several retail stores that sold those products.  One of
4  the stores named as a defendant, Bill's Dollar Stores, Inc.,
5  d/b/a Bill's Dollar Store ("Bill's Dollar Store"), is a Missis-
6  sippi corporation.  Two of the six total plaintiffs purchased
7  PPA-containing products from Bill's Dollar Store.[1]

8     Defendants removed the complaint to federal court alleging
9  that plaintiffs fraudulently joined Bill's Dollar Store.  Plain-
10  tiffs moved to remand to state court.  The case was later trans-
11  ferred to this court as part of a multi-district litigation
12  ("MDL").

13              II.  ANALYSIS

14     A plaintiff cannot defeat federal jurisdiction by fraudu-
15  lently joining a non-diverse party.  As an MDL court sitting in
16  the Ninth Circuit, this court applies the Ninth Circuit's fraudu-
17  lent joinder standard to the motion to remand.  See, e.g., In re
18  Diet Drugs Prods. Liab. Litig., 220 F. Supp. 2d 414, 423 (E.D.
19  Pa. 2002); In re Bridgestone/Firestone, 204 F. Supp. 2d 1149,
20  1152 n.2 (S.D. Ind. 2002); In re Tobacco/Gov'tal Health Care
21  Costs Litig., 100 F. Supp. 2d 31, 34 n.1 (D. D.C. 2000); In re

22

23     [1]Defendants assert the misjoinder of these plaintiffs'
     claims and request that the court sever and deny remand as to the
24  four plaintiffs who did not purchase any products from Bill's
     Dollar Store, or from any other Mississippi store.  However,
25  because, as discussed below, the court denies remand as to all
     plaintiffs named in this action, the court need not address the
26  question of misjoinder at this time.

ORDER
Page - 2 -

M00224596

EXHIBIT 2 - PAGE 020

1  _Ford Motor Co. Bronco II Prods. Liab. Litig._, MDL-991, 1996 U.S.

2  Dist. LEXIS 6769, at *2-4. (E.D. La. May 16, 1996).[2]  Under this

3  standard, joinder of a non-diverse party is deemed fraudulent

4  "'[i]f the plaintiff fails to state a cause of action against a

5  resident defendant, and the failure is obvious according to the

6  settled rules of the state.'"  _Morris v. Princess Cruises, Inc._,

7  236 F.3d 1061, 1067 (9th Cir. 2001) (quoting _McCabe v. General_

8  _Foods Corp._, 811 F.2d 1336, 1339 (9th Cir. 1987)).[3]

9       The propriety of removal to federal court is determined from

10  the allegations in the complaint at the time of removal.  _See_

11  _Ritchey v. Upjohn Drug Co._, 139 F.3d 1313, 1318 (9th Cir. 1998)

12  However, in the case of fraudulent joinder, the defendant "'is

13  entitled to present the facts showing the joinder to be fraudu-

14  lent.'"  _Id._ (quoting _McCabe_, 811 F.2d at 1339).  _See also Morris_

15  _____

16  [2] _See generally Menowitz v. Brown_, 991 F.2d 36, 40-41 (2d
Cir. 1993); _In Re Korean Airlines Disaster_, 829 F.2d 1171, 1174-

17  76 (D.C. Cir. 1987).

18  [3] However, as a practical matter, application of the Fifth
Circuit's fraudulent joinder standard would not alter the court's

19  conclusion.  _See Badon v. RJR Nabisco, Inc._, 224 F.3d 382, 393
(5th Cir. 2000) (remand is denied where there is "no reasonable

20  basis for predicting that plaintiffs might establish liability .

21  . . against the in-state defendants.")  For example, recent MDL
courts utilized fraudulent joinder standards similar, and in one

22  case identical, to the Fifth Circuit's standard in deeming
Mississippi pharmacies and their employees fraudulently joined

23  for reasons similar to those expressed in this opinion.  _See In_
_re Diet Drugs Prods. Liab. Litig._, 220 F. Supp. 2d at 423-24

24  (noting that there had been "a pattern of pharmacies being named
in complaints, but never pursued to judgment, typically being

25  voluntarily dismissed at some point after the defendants' ability
to remove the case has expired"); _In re Rezulin Prods. Liab._

26  _Litig._, 133 F. Supp. 2d 272, 279 & n.3, 288-92 (S.D.N.Y. 2001).

ORDER
Page - 3 -

M00024457

EXHIBIT 2 - PAGE 021

1   236 F.3d at 1067-68 (citing <u>Cavallini v. State Farm Mut. Auto.</u>

2   <u>Ins. Co.</u>, 44 F.3d 256, 263 (5th Cir. 1995) for the proposition

3   that the court may "'pierc[e] the pleadings'" and consider

4   "summary judgment-type evidence.")

5         Defendants allege that plaintiffs fraudulently joined Bill's

6   Dollar Store, while plaintiffs claim the existence of legitimate

7   causes of action against Bill's Dollar Store, including products

8   liability, negligence, misrepresentation, and implied warranty

9   claims.  The parties also argue as to the relevance of a bank-

10   ruptcy petition filed by Bill's Dollar Store prior to the filing

11   of this suit.

12   A.     <u>Products Liability</u>

13         The complaint contains failure to warn and design defect

14   allegations pursuant to the Mississippi Products Liability Act.

15   Miss. Code Ann. § 11-1-63.  Under the Products Liability Act,

16   plaintiff must show that at the time the product left the control

17   of the manufacturer or seller, it was defective in failing to

18   contain adequate warnings or instructions, and/or was designed in

19   a defective manner.  Miss. Code Ann. § 11-1-63 (a)(i)(2)-(3).

20   Plaintiff must also show that the manufacturers and sellers knew,

21   or in light of reasonably available knowledge or the exercise of

22   reasonable care should have known, about the danger that caused

23   the alleged damage.  Miss. Code Ann. § 11-1-63 (c)(i),(f)(i);[4]

24   _____

25       [4]<u>See also Huff v. Shopsmith, Inc.</u>, 786 So.2d 383, 387 (Miss.
2001)("With the adoption of 11-1-63, common law strict liability,

26   as laid out in <u>Slate Stove Mfg. Co. v. Hodges</u>, 189 So.2d 113

ORDER
Page - 4 -

EXHIBIT 2 - PAGE 022

1    Plaintiffs allege in the complaint that "defendants" or "all
2 defendants" knew or should have known of dangers associated with
3 PPA.  Moreover, plaintiffs specifically aver this knowledge or
4 reason to know on the part of the retailer defendants, including
5 Bill's Dollar Store.  However, the court finds that no factual
6 basis can be drawn from the complaint that Bill's Dollar Store
7 had knowledge or reason to know of any dangers allegedly associ-
8 ated with PPA.
9    First, the complaint utilizes the plural "defendants" in a
10 number of allegations that one could not reasonably interpret to
11 include Bill's Dollar Store.  See, e.g., Louis v. Wyeth-Ayerst
12 Pharm., Inc., No. 5:00CV102LN, slip op. at 5-9 (S.D. Miss. Sep.
13 25, 2000) (finding products liability allegations lodged against
14 "defendants" conclusory where there was no factual support for
15 conclusion that Mississippi pharmacies had knowledge or reason to
16 know of alleged dangers associated with various diet drugs).[5]
17 _____
18 (Miss. 1966), is no longer the authority on the necessary
   elements of a products liability action.")
19
20    [5] See also In re Diet Drugs Prods. Liab. Litig., 220 F. Supp.
   2d at 424 (finding complaints, including failure to warn,
21 negligence, breach of warranty, and strict liability claims,
   devoid of specific allegations against Mississippi pharmacies and
22 "filled instead with general statements levied against all
   defendants, which most properly can be read as stating claims
23 against drug manufacturers."); In re Rezulin Products Liab.
   Litig., 133 F. Supp. 2d at 291 (finding improper joinder in case
24 where Mississippi pharmacies were lumped in with manufacturers
   and acts alleged, including failure to warn, breach of warranty,
25 and fraud, were attributed to "'defendants' generally", but
   never connected to the pharmacies); accord Badon, 224 F.3d at
26 391-93 ("While the amended complaint does often use the word

   ORDER
   Page - 5 -

EXHIBIT 2 - PAGE 023

1  For example, the complaint describes "defendants" as members of
2  the Non-Prescription Drug *Manufacturers* Association ("NDMA").
3  Through this association, "defendants" purportedly participated
4  in numerous discussions relating to the safety of PPA over the
5  past two decades, had representatives sit on the NDMA PPA Task
6  Force, and funded relevant studies.  In other words, plaintiffs,
7  in significant part, demonstrate "defendants'" knowledge as to
8  risks allegedly posed by PPA through activities engaged in by
9  manufacturer defendants alone.

10      Indeed, while "defendants" are alleged to have been aware or
11  to have had responsibility for awareness of numerous scientific
12  journal articles, incident reports, medical textbooks, and other
13  reports containing information as to risks of PPA consumption,
14  general medical practitioners are excluded from this awareness
15  and described as being not "fully informed."  The complaint
16  supplies no factual support for a conclusion that a dollar store
17  possessed medical and scientific knowledge beyond that possessed
18  by medical practitioners.

19      Second, the complaint specifically lays the responsibility
20  for allegedly concealing dangers posed by PPA on the manufacturer
21  defendants.  For example, the complaint alleges that the manufac-
22  turer defendants concealed material facts regarding PPA through
23  product packaging, labeling, advertising, promotional campaigns

24  ───────────────
25  'defendants,' frequently it is evident that such usage could not
   be referring to the 'Tobacco Wholesalers;'"; finding conspiracy
26  allegations against Louisiana defendants entirely general).

ORDER
Page - 6 -

EXHIBIT 2 - PAGE 024

1  and materials, and other methods.  This allegation directly
2  undermines and contradicts the idea that Bill's Dollar Store had
3  knowledge or reason to know of alleged defects.  See, e.g.,
4  Louis, slip op. at 4-5 (finding complaint's "major theme" to
5  consist of the "manufacturers' intentional concealment of the
6  true risks of the drug(s), coupled with dissemination through
7  various media of false and misleading information of the safety
8  of the drug(s) at issue, [which belied] any suggestion of knowl-
9  edge, or reason to know by [the] resident defendants.")  Cf. In re
10  Rezulin Products Liab. Litig., 133 F. Supp. 2d 272, 290 (S.D.N.Y.
11  2001) (finding Mississippi pharmacies facing failure to warn
12  claims fraudulently joined where "the theory underlying the
13  complaints [was] that the manufacturer defendants hid the dangers
14  of Rezulin from plaintiffs, the public, physicians, distributors
15  and pharmacists -- indeed from everyone.")
16     In sum, the court concludes that one could not reasonably
17  read the complaint to support the idea that the retailer defen-
18  dants had knowledge or reason to know of any dangers allegedly
19  associated with PPA.  Indeed, reading the complaint as a whole,
20  this allegation reveals itself as directed towards the manufac-
21  turer defendants alone.  As such, the court finds that plaintiffs
22  fail to state a products liability cause of action against Bill's
23  Dollar Store.[6]

24  _____

25     [6] The complaint once alludes to an "alternative" breach of
    express warranty claim under the Products Liability Act.  See
26  Miss. Code Ann. § 11-1-63 (a)(i)(4) (requiring a showing that the

ORDER
Page - 7 -

M0026X591

EXHIBIT 2 - PAGE 025

**B.   Negligence and Misrepresentation**

The complaint alleges negligence and misrepresentation by
Bill's Dollar Store.  A negligence cause of action also requires
a showing of knowledge or reason to know on the part of the
seller.  See, e.g., R. Clinton Constr. Co. v. Bryant & Reaves,
Inc., 442 F. Supp. 838, 851 (N.D. Miss. 1977) ("The rule is well
settled that in order to fasten liability upon a party for
negligence, it must be shown by a preponderance of the evidence
that he knew or through the exercise of reasonable care should
have known that his selection of a [product] would cause damage
to his customer.")[7]  A misrepresentation cause of action requires

---

seller breached an express warranty or failed to conform to other
express factual representations upon which the claimant relied).
However, the products liability allegations go on to touch solely
upon failure to warn and design defect claims.  Because the
complaint lacks any factual basis for support of a breach of
express warranty claim against Bill's Dollar Store, the court
also finds this bare allegation insufficient to support remand.

[7]Accord Louis, slip op. at 3-4 & n.3 ("[K]nowledge, or a
reason to know, is also a necessary requisite for any claim of
failure to warn or negligence that a plaintiff might undertake to
assert extraneous to a claim under the Products Liability Act
itself (assuming solely for the sake of argument that such a
claim could exist)."); Cadillac Corp. v. Moore, 320 So.2d 361,
365 (Miss. 1975) (discussing negligence in "vendor/purchaser"
context and stating that "fault on the part of a defendant so as
to render him liable is to be found in action or nonaction,
accompanied by knowledge, actual or implied, of the probable
result of his conduct.")  Cf. Moore v. Memorial Hosp. of
Gulfport, 825 So.2d 658, 664-66 (Miss. 2002) (extending "learned
intermediary" doctrine to pharmacists in case involving
prescription drug, and holding no actionable negligence claim
could exist against a pharmacy unless a plaintiff indisputably
informed the pharmacy of health problems which contraindicated
the use of the drug in question, or the pharmacist filled

ORDER
Page - 8 -

EXHIBIT 2 - PAGE 026

1  a plaintiff to show:

2      (1) a representation; (2) its falsity; (3) its materi-
       ality; (4) the speaker's knowledge of its falsity or
3      ignorance of its truth; (5) the speaker's intent that
       the representation should be acted upon by the hearer
4      and in the manner reasonably contemplated; (6) the
       hearer's ignorance of its falsity; (7) the hearer's
5      reliance on its truth; (8) the hearer's right to rely
       thereon; and (9) the hearer's consequent and proximate
6      injury.

7  Johnson v. Parke-Davis, 114 F. Supp. 2d 522, 525 (S.D. Miss.

8  2000) (citing Allen v. Mac Tools, Inc., 671 So.2d 636, 642 (Miss.

9  1996)).

10     Again, the court finds that the general and contradictory

11 allegations in the complaint do not support the existence of any

12 knowledge or reason to know on the part of Bill's Dollar Store to

13 support a negligence cause of action.  The court finds the

14 complaint similarly bereft of any factual support for the idea

15 that Bill's Dollar Store made any misrepresentations whatsoever

16 to plaintiffs regarding the PPA-containing products.  See, e.g.,

17 Johnson, 114 F. Supp. 2d at 525 ("Suffice it to say that Plain-

18 tiffs have no proof . . . that any of the named [Mississippi]

19 representatives made any representations directly to any of the

20 Plaintiffs.  Thus, none of the Plaintiffs was the 'hearer' of any

21 of the sales representatives' alleged misrepresentations.";

22 finding plaintiffs had no cause of action for misrepresentation).

23 Instead, as discussed above, the complaint attributes this

24

25 ────────────────
   prescriptions in quantities inconsistent with the recommended
26 dosage guidelines).

   ORDER
   Page - 9 -

MC0020453

EXHIBIT 2 - PAGE 027

1   behavior to the manufacturing defendants alone.  As such, the
2   court also finds that plaintiffs fail to state negligence and
3   misrepresentation causes of action against Bill's Dollar Store.
4   C.   Implied Warranty
5        The complaint also alleges that Bill's Dollar Store breached
6   implied warranties of merchantability and fitness for particular
7   purpose.  See Miss. Code Ann. §§ 75-2-314, .315.  The complaint
8   accuses "defendants" of breaching the implied warranty of mer-
9   chantability in failing to adequately label containers and
10  packages containing PPA, and because the products sold failed to
11  conform to promises or affirmations of facts made on the contain-
12  ers or labels.  See Miss. Code Ann. § 75-2-314 (2)(e)-(f).  The
13  complaint accuses both manufacturers and sellers of breaching the
14  implied warranty of fitness for particular purpose where they had
15  reason to know of the particular use of the products, and the
16  purchasers relied on the sellers' skill or judgment in selecting
17  and furnishing suitable and safe products.  See Miss. Code Ann. §
18  75-2-315.
19       In order to recover for breach of implied warranty, a buyer
20  "must within a reasonable time after he discovers or should have
21  discovered any breach notify the seller of breach or be barred
22  from any remedy."  Miss. Code Ann. § 75-2-607 (3)(a); accord C.R.
23  Daniels, Inc. v. Yazoo Mfg. Co., 641 F. Supp. 205, 210-11 (S.D.
24  Miss. 1986); Gast v. Rogers-Dingus Chevrolet, 585 So. 2d 725,
25  730-31 (Miss. 1991).  Here, the complaint contains no indication
26  that plaintiffs provided Bill's Dollar Store with any notice as

ORDER
Page - 10 -

M0002484

EXHIBIT 2 - PAGE 028

1 | to an alleged breach of warranty prior to the institution of this
2 | lawsuit.
3 |     Additionally, with respect to the merchantability claim, the
4 | complaint contains no factual support for a conclusion that
5 | Bill's Dollar Store was in any way involved with the labeling
6 | and/or packaging of the products at issue.  Instead, the com-
7 | plaint alleges that the manufacturer defendants concealed mate-
8 | rial facts regarding PPA through product packaging and labeling.
9 |     The court likewise finds plaintiffs' fitness for particular
10 | purpose allegation insufficient.  "Mississippi does not recognize
11 | an implied warranty of fitness for a particular purpose when the
12 | good is purchased for the ordinary purpose of a good of that
13 | kind."  Farris v. Coleman Co., 121 F. Supp. 2d 1014, 1018 (N.D.
14 | Miss. 2000) (fitness for particular purpose claim failed where
15 | plaintiff purchased cooler to keep food and beverages cold - the
16 | ordinary purpose for which a cooler is used).  Here, plaintiffs
17 | attested that they purchased PPA-containing products to remedy
18 | their "cold, flu, sinus and/or allergy symptoms" - the ordinary
19 | purpose of these medications.
20 |     Therefore, for the reasons stated above, the court finds
21 | that plaintiffs fail to state implied warranty causes of action
22 | against Bill's Dollar Store.
23 | D.   **Bankruptcy**
24 |     Bill's Dollar Store filed a bankruptcy petition in February
25 | 2001, several months prior to the filing of plaintiffs' com-
26 | plaint.  The filing of the bankruptcy petition operates as a stay

ORDER
Page - 11 -

M00324985

EXHIBIT 2 - PAGE 029

1  on judicial or other proceedings brought against Bill's Dollar
2  store that were or could have commenced prior to the commencement
3  of the bankruptcy proceeding. See 11 U.S.C. § 362(a); In re
4  Cajun Elec. Power Co-Op. Inc., 185 F.3d 446, 457 (5th Cir. 1999).

5      Plaintiffs argue that the automatic stay poses no barrier to
6  relief given that they were unaware of the bankruptcy petition at
7  the time they filed their complaint, and because they anticipate
8  that the Bankruptcy Court will agree to their pending request to
9  lift the stay.  However, whether or not plaintiffs knew of the
10 petition and whether or not the stay may later be lifted, the
11 fact remains that, at the time plaintiffs filed their complaint,
12 the stay operated to prohibit their lawsuit.  As noted above, the
13 court determines jurisdiction based on the claims as stated at
14 the time of removal.  As such, the court finds the existence of
15 the stay at the time of filing serves as an additional reason to
16 deny remand of this matter to state court.  Cf. Ritchey, 139 F.3d
17 at 1319-20 (denying remand where the statute of limitations had
18 expired at the time plaintiff filed the complaint).[8]

19                    III.   CONCLUSION
20     The court concludes that plaintiffs fail to state a cause of
21 action against the only non-diverse defendant, and that the
22 _____
23    [8]Unlike in a number of other cases transferred to this MDL,
   the defendants here did not supply the court with any summary
24 judgment-type evidence to establish the retailer defendant's
   fraudulent joinder.  However, the court nonetheless finds that a
25 plain reading of the complaint does not allow a conclusion that
   plaintiffs state a cause of action against Bill's Dollar Store.
26

ORDER
Page - 12 -

M00024588

EXHIBIT 2 - PAGE 030

1  failure is obvious according to the settled rules of Mississippi.
2  As such, the court finds Bill's Dollar Store fraudulently joined
3  and DENIES plaintiff's motion to remand the case to the state
4  courts of Mississippi.
5      DATED at Seattle, Washington this 26th day of November,
6  2002.
7
8                          BARBARA JACOBS ROTHSTEIN
                           UNITED STATES DISTRICT JUDGE
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
   ORDER
   Page - 13 -

EXHIBIT 2 - PAGE 031

# EXHIBIT 3

1   Kenneth M. Seeger (State Bar No. 135862)
2   Brian J. Devine (State Bar No. 215198)
   SEEGER • SALVAS LLP
3   455 Market Street, Suite 1530
   San Francisco, CA 94105
4
   Telephone:  (415) 981-9260
5   Facsimile:  (415) 981-9266

6   Attorneys for Plaintiffs Mary Lyster and Gordon Lyster

FILED

2011 MAR 10  A 9: 42

PER LOCAL RULES 5 THIS
CASE IS ASSIGNED TO
DEPT. _____

K. TORRE, CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.
BY: _____
A. Nunino, Deputy Clerk

7

8              *SUMMONS ISSUED*

             SUPERIOR COURT OF CALIFORNIA
9
             COUNTY OF CONTRA COSTA
10

| 11 | MARY LYSTER and GORDON LYSTER, | No.   **C 11 - 00570** |
|---|---|---|
| 12 |             Plaintiffs, | **COMPLAINT FOR:** |
| 13 | vs. | **(1) STRICT PRODUCT LIABILITY,** |
| 14 | DEPUY ORTHOPAEDICS, INC., | **(2) NEGLIGENCE,**<br>**(3) BREACH OF IMPLIED** |
| 15 | THOMAS P. SCHMALZRIED, M.D. A<br>PROFESSIONAL CORPORATION, and | **WARRANTIES,**<br>**(4) BREACH OF EXPRESS WARRANTY,** |
| 16 | DOES 1 through 20, inclusive, | **and**<br>**(5) LOSS OF CONSORTIUM** |
| 17 |             Defendants. | |
| 18 | | **JURY TRIAL DEMANDED** |

19

20              <u>SUMMARY OF CASE</u>    **BY FAX**

21

22        1.      This product liability case is about the failure of an untested and

23   unapproved hip implant that was designed, manufactured, and sold by the Defendants and

24   implanted in Plaintiff Mary Lyster. Mrs. Lyster's story is a tragic example of the pain, anguish,

25   and damages that are caused when a company continues selling a hip implant long after it realizes

26   that the product has a defect and even long after that defect injured hundreds of people.

27

28

                     - 1 -

                     Complaint

SEEGER • SALVAS LLP

EXHIBIT 3 - PAGE 032

SEEGER · SALVAS LLP

**PARTIES**

2. Plaintiff Mary Lyster is a citizen of the State of California and resides in Brentwood, California.

3. Plaintiff Gordon Lyster is, and at all times relevant to this Complaint was, Mary Lyster's husband. He is a citizen of the State of California and resides in Brentwood, California.

4. On information and belief, Defendant DePuy Orthopaedics, Inc. ("DePuy") is a corporation organized and existing under the laws of Indiana with its primary place of business in Warsaw, Indiana. On information and belief, DePuy does not maintain a principal local office in California. DePuy designed, manufactured, and sold the hip implant that is the subject of this lawsuit.

5. On information and belief, Defendant Thomas P. Schmalzried, M.D. A Professional Corporation ("TPS Corp.") is a corporation organized and existing under the laws of California with its primary place of business in Los Angeles, California. TPS Corp. designed the hip implant that is the subject of this lawsuit. TPS Corp. collects royalties for each hip implant sold, and in the last two years alone, it has collected more than $3.4 million in such royalty payments. In addition to designing the hip implant component that was implanted in Plaintiff and collecting royalties for the sale of Plaintiff's implant, TPS Corp. remained actively involved in promoting and marketing the Pinnacle Acetabular Cup and the Pinnacle Metal Insert (collectively referred to herein as the "Pinnacle Hip.") TPS Corp., by and through its shareholder, director, and officer, Dr. Thomas Schmalzried, was a "product champion" for the Pinnacle Hip. In the orthopedics community, a "product champion" uses his or her reputation as a prominent orthopedic surgeon to encourage other orthopedic surgeons to use a new product. In his role as a "product champion" for the Pinnacle Hip, Dr. Schmalzried, on behalf of TPS Corp., made

- 2 -

Complaint

EXHIBIT 3 - PAGE 033

1   representations to orthopedic surgeons, including Plaintiff's orthopedic surgeon, that the Pinnacle

2   Hip was safe and effective. Although it knew or should have known about defects in the Pinnacle

3   Hip at the time the Pinnacle Hip was sold to Plaintiff, TPS Corp. did not disclose that information

4   to Plaintiff or Plaintiff's doctors. Despite a legal duty to disclose the information to Plaintiff and

5   Plaintiff's doctors, TPS Corp. actively concealed mounting problems with the Pinnacle Hip, and

6   it instead deflected blame for the mounting failures by blaming the surgical technique of the

7   implanting orthopedic surgeon.

8

9          6.    The true names and capacities of Does 1 through 20 are unknown to

10  Plaintiffs. Plaintiffs are informed and believe and thereon allege that each of these Defendants

11  are in some way liable for the events referred to in this Complaint and caused damage to

12  Plaintiffs. Plaintiffs will amend this Complaint and insert the correct names and capacities of

13  those Defendants when they are discovered.

14

15         7.    At all times mentioned, each of the Defendants—including DOES 1

16  through 20—was the representative, agent, employee, joint venturer, or alter ego of each of the

17  other defendants and in doing the things alleged herein was acting within the scope of its

18  authority as such.

19

20         8.    DePuy, TPS Corp., and DOES 1 through 20 are collectively referred to

21  herein as "Defendants."

22

23                          **FACTUAL BACKGROUND**

24  **A.    DePuy's Pinnacle Hip Is Unsafe And Has Not Been Adequately Tested**

25         9.    The hip joint is where the femur connects to the pelvis. The joint is made

26  up of the femoral head (a ball-like structure at the very top of the femur) rotating within the

27  acetabulum (a cup-like structure at the bottom of the pelvis.) In a healthy hip, both the femur and

28

SEEGER · SALVAS LLP

-3-

Complaint

EXHIBIT 3 - PAGE 034



1    the acetabulum are strong and the rotation of the bones against each

2    other is cushioned and lubricated by cartilage and fluids.

3

4         10.    A total hip replacement replaces the body's

5    natural joint with an artificial one, usually made out of metal and

6    plastic. A typical total hip replacement system consists of four separate components: (1) a

7        femoral stem (labeled as "hip implant" in the diagram to

8    the left), (2) a femoral head, (3) a plastic (polyethylene)

9    liner, and (4) an acetabular shell. After the surgeon

10   hollows out a patient's femur bone, the femoral stem is

11   implanted. The femoral head is a metal ball that is fixed

12   on top of the femoral stem. The femoral head forms the

13   hip joint when it is placed inside the polyethylene liner

14   and acetabular shell.

15

16        11.    The Pinnacle Hip has a different design, one that puts the metal femoral

17   ball directly in contact with a metal acetabular liner. The design of the Pinnacle Hip was not

18   sufficiently tested by the Defendants, and it was never approved by the FDA as being safe or

19   effective for the products' intended purpose.

20

21        12.    The Pinnacle Hip is a Class III medical device. Class III devices are those

22   that operate to sustain human life, are of substantial importance in preventing impairment of

23   human health, or pose potentially unreasonable risks to patients.

24

25        13.    The Medical Device Amendments to the Food, Drug, and Cosmetics Act of

26   1938 ("MDA"), in theory, require Class III medical devices, including the Pinnacle Hip, to

27   undergo premarket approval by the FDA, a process which obligates the manufacturer to design

28   and implement a clinical investigation and to submit the results of that investigation to the FDA.

- 4 -

Complaint

EXHIBIT 3 - PAGE 035

SEEGER • SALVAS LLP

14.     Premarket approval is a rigorous process that requires a manufacturer to submit what is typically a multivolume application that includes, among other things, full reports of all studies and investigations of the device's safety and effectiveness that have been published or should reasonably be known to the applicant; a full statement of the device's components, ingredients, and properties and of the principle or principles of operation; a full description of the methods used in, and the facilities and controls used for, the manufacture, processing, and, when relevant, packing and installation of, such device; samples or device components required by the FDA; and a specimen of the proposed labeling.

15.     The FDA may grant premarket approval only if it finds that there is reasonable assurance that the medical device is safe and effective and must weigh any probable benefit to health from the use of the device against any probable risk of injury or illness from such use.

16.     A medical device on the market prior to the effective date of the MDA – a so-called "grandfathered" device – was not required to undergo premarket approval.

17.     In addition, a medical device marketed *after* the MDA's effective may bypass the rigorous premarket approval process if the device is "substantially equivalent" to a "grandfathered" pre-MDA device (*i.e.*, a device approved prior to May 28, 1976). This exception to premarket approval is known as the "510(k)" process and simply requires the manufacturer to notify the FDA under section 510(k) of the MDA of its intent to market a device at least 90 days prior to the device's introduction on the market, and to explain the device's substantial equivalence to a pre-MDA predicate device. The FDA may then clear the new device for sale in the United States.

18.     The MDA does not require an FDA determination that the device is in fact, substantially equivalent to a grandfathered device.

- 5 -

Complaint

SEEGER · SALVAS LLP

EXHIBIT 3 - PAGE 036

1          19.    Instead of assuring the safety of the Pinnacle Hip through clinical trials,

2  DePuy sought to market its Pinnacle Hip without conducting any clinical trials by obtaining FDA

3  approval under section 510(k). To that end, Defendants submitted a section 510(k) premarket

4  notification of intent to market the Pinnacle Hip.

5

6          20.    By telling the FDA that the Pinnacle Hip's design was "substantially

7  equivalent" to other hip products on the market, DePuy was able to avoid the safety review

8  required for premarket approval under FDA regulations including clinical trials.

9

10         21.    The FDA cleared the Pinnacle Hip for sale by means of the abbreviated

11  510(k) process and consequently, the FDA did not require the Pinnacle Hip to undergo clinical

12  trials.

13

14         22.    The 510(k) notification for the Pinnacle Hip includes only Defendant

15  DePuy's assertion that it believes the DePuy Pinnacle Hip to be substantially equivalent to

16  devices that themselves had never been reviewed for safety and effectiveness.

17

18         23.    Significantly, unlike the premarket approval process, the 510(k)

19  notification process does not call for scrutiny – or even clinical testing – of a device's safety and

20  effectiveness.

21

22         24.    A finding of substantial equivalence is not equivalent to a finding of a

23  device's safety and effectiveness. This point is forcefully underscored by the FDA's letter to

24  DePuy, which says nothing about the safety and effectiveness of the Pinnacle Hip; finds only that

25  the device was "substantially equivalent to devices introduced into interstate commerce prior to

26  May 28, 1976"; and concludes by stressing that the agency's determination of substantial

27  equivalence "does not mean that FDA has made a determination that your device complies with

28

SEEGER · SALVAS LLP

EXHIBIT 3 - PAGE 037

1   other requirements of the Act or any Federal statutes and regulations administered by other

2   Federal agencies."

3

4       25.    Thus, the FDA's finding of "substantial equivalence" had nothing to do

5   with reviewing the Pinnacle Hip's safety and effectiveness, but rather only a determination of

6   equivalence to devices that themselves underwent no safety and effectiveness review.

7

8       26.    While most hip replacements use a polyethylene *plastic* acetabular liner,

9   DePuy's Pinnacle Hip has a critical difference: it uses a *metal* acetabular liner. By using a metal

10  acetabular liner and a metal femoral ball, the Pinnacle Hip forces metal to rub against metal with

11  the full weight and pressure of the human body. Because of Defendants' defective design for the

12  Pinnacle Hip, hundreds of patients—including Mrs. Lyster—have been forced to undergo

13  surgeries to replace the failed hip implants.

14

15      27.    Plaintiffs believe that the Pinnacle Hip suffers from a similar design or

16  manufacturing defect that forced DePuy to recall over 93,000 metal-on-metal ASR and ASR XL

17  hip implants. While the exact nature of the common defect is still being investigated, Plaintiffs

18  believe that both hip implants suffer from one or more design or manufacturing defects that cause

19  excessive amounts of cobalt and chromium to wear from the surface of the acetabular insert or

20  from the femoral head. These cobalt and chromium fragments prompt the body to react by

21  rejecting the hip implant. This rejection often manifests with symptoms of pain, looseness,

22  dislocation, and squeaking and popping sounds. Inside the hip joint, the metal reaction often

23  causes fluids to accumulate and soft tissues and bone to die.

24

25  **B.   DePuy Should Have Recalled The Pinnacle Hip Years Ago; Over 1,300 Adverse
         Events Related To The Pinnacle Hip Have Been Reported**

26

27      28.    It wasn't long after DePuy launched the Pinnacle Hip that reports of

28  failures began flooding into DePuy. For example, on May 4, 2002, DePuy received a complaint

EXHIBIT 3 - PAGE 038

1    that a patient had to undergo a surgery to remove and replace the hip implant because the liner

2    disassociated with the cup. DePuy closed its investigation of this complaint, finding that

3    "corrective action is not indicated." Two weeks later, on May 17, 2002, DePuy received another

4    report that another patient had to undergo surgery to remove and replace a defective hip implant

5    because the acetabular cup had loosened. Again, DePuy closed its investigation of this complaint,

6    finding that "corrective action is not indicated."

7

8         29.    DePuy would go on to receive hundreds of similar complaints reporting

9    that the Pinnacle Hip had failed due to premature loosening of the acetabular cup and that the

10    failure had forced patients to undergo painful and risky surgeries to remove and replace the failed

11    hip component.

12

13         30.    By the time DePuy sold the Pinnacle Hip to Mary Lyster in August 2009,

14    DePuy had received more than 600 complaints related to the Pinnacle Hip. Consequently, DePuy

15    was fully aware that the Pinnacle Hip was defective and that hundreds of patients already had

16    been injured by that defect. Based on this information, DePuy should have recalled the Pinnacle

17    Hip before it was sold to Mrs. Lyster. At minimum, DePuy should have stopped selling the

18    defective implant when it became aware that it has catastrophically failed in several patients.

19

20         31.    As the chart to

21    the right shows, over the next two

22    years, reports that the Pinnacle

23    implant had failed were flooding

24    into DePuy. For example, by the

25    end of 2008, DePuy had received

26    more than 430 reports and by the

27    end of 2009, that number had

28    skyrocketed to almost 750. To date,



Pinnacle Complaints Reported to DePuy

SEEGER • SALVAS LLP

- 8 -

Complaint.

EXHIBIT 3 - PAGE 039

1   DePuy has received an astonishing *1,300 reports* associated with Pinnacle Hips.

2

3       32.    Despite its knowledge that the Pinnacle hip had a defect and that it had

4   failed hundreds of times, causing hundreds of patients to undergo the agony of another surgery,

5   DePuy continued to sell the defective hip implant. In so doing, DePuy actively concealed the

6   known defect from doctors and patients—including Mrs. Lyster and her doctor—and

7   misrepresented that that the Pinnacle Hip was a safe and effective medical device.

8

9       33.    DePuy's reason to conceal the defect in its Pinnacle Hip is clear. In 2009

10  alone, DePuy brought in more than $5.4 billion in sales. Hip implant sales are critically important

11  to DePuy's parent company, Johnson & Johnson, and DePuy is one of Johnson & Johnson's most

12  profitable business groups. In 2008, DePuy was faced with a critical defect in one of its hip

13  implant system. The last thing DePuy wanted to do was to admit that these popular products had

14  a critical defect that could cause a premature failure, forcing patients to have to undergo another

15  painful surgery. Focused on corporate profits, and at the expense of patient safety, DePuy

16  decided that it would not issue an embarrassing recall when it learned of the defects with its

17  Pinnacle Hip. Moreover, motivated by greed rather than patient safety, DePuy did not even stop

18  selling the Pinnacle Hip. Instead, it continued to manufacture the hip implants and it continued to

19  sell them to unsuspecting patients like Mrs. Lyster. To this day, DePuy continues to sell these

20  defective implants to unsuspecting patients without any warning about the risks or the failures

21  that have been reported to the company.

22

23  **C.   Mrs. Lyster's Pinnacle Hip Was Defective And Failed, Forcing Her To Need An
      Additional Painful And Risky Surgery To Remove The Defective Component**

24

25      34.    On August 24, 2009, Mrs. Lyster underwent a surgical procedure to

26  implant the Pinnacle Hip in her right hip. By this time, Defendants had already received over 600

27  reports that the Pinnacle Hip had failed and it knew that the product was defective, but

28  Defendants refused to disclose that information to Mrs. Lyster, her physicians, or the public.

-9-

Complaint

EXHIBIT 3 - PAGE 040

1    35. From the beginning, Mrs. Lyster's hip was painful. Her hip pain grew over

2 time and was constant. It felt like a burning coal inside her hip and she required medication to

3 control the pain. Because of the pain, she was unable to stand, walk or sit for more than ten

4 minutes. She required the use of a cane, walker, and in some cases, a wheelchair. After the hip

5 replacement surgery, Mrs. Lyster also began to notice other problems throughout her body. For

6 example, she experienced heart irregularities, tinnitus, hearing loss, and trouble urinating.

7

8    36. At first Mrs. Lyster's doctors couldn't find the cause of her pain. Her

9 doctors gave her cortisone shots, epidurals, and prescribed pain medication. But they were unable

10 to diagnose the cause of her pain until 2010.

11

12    37. While Mrs. Lyster and her doctors were desperately searching for the cause

13 of her pain, the Defendants were actively concealing their knowledge that the Pinnacle Hip

14 implant was defective. Defendants actively attempted to prevent Mrs. Lyster and her physicians

15 from suspecting that her pain was being caused by a defect in the Pinnacle Hip. Because of the

16 Defendants' active concealment of their knowledge about the product defect and the failures,

17 Mrs. Lyster had to suffer with debilitating pain while her physicians attempted to discover the

18 cause.

19

20    38. After problems with metal-on-metal implants began to be reported in the

21 media, and after DePuy recalled its ASR hip implants, Mrs. Lyster began to suspect that her hip

22 implant may be failing. Her doctor performed blood tests to check for metal ions, and concluded

23 that she has significantly elevated levels of cobalt, chromium, and nickel. Her doctor diagnosed

24 her with a failed hip implant and scheduled her for a surgery to remove and replace the defective

25 DePuy hip implant.

26

27    39. On March 10, 2010, Mrs. Lyster will undergo a painful, complex and risky

28 surgery (known as a "revision surgery") to remove and replace the Pinnacle Hip that has failed.

SEEGER · SALVAS LLP

EXHIBIT 3 - PAGE 041

1    Revision surgeries are generally more complex than the original hip replacement surgery, often

2    because there is a reduced amount of bone in which to place the new hip implants. Revision

3    surgeries also usually take longer than the original hip replacement surgery and the revision

4    surgery has a higher rate of complications.

5

6          40.     Mrs. Lyster's recovery from the revision surgery will be long and painful.

7    Mrs. Lyster's injuries may be permanent, and they may cause additional complications in the

8    future.

9

10         41.     Having to go through a revision surgery will subject Mrs. Lyster to much

11    greater risks of future complications than she had before the revision surgeries. For example,

12    several studies have found that a revision surgery causes a much higher risk of dislocation

13    compared with an original hip replacement surgery. In one study conducted by Charlotte Phillips

14    and her colleagues at Brigham and Women's Hospital in Boston, 14.4 percent of patients who

15    underwent a revision surgery suffered from a dislocation compared with 3.9 percent of patients

16    who underwent a original hip replacement surgery. In other words, hip replacement patients who

17    have undergone a revision surgery are almost *four times more likely* to suffer from a hip

18    dislocation than those who have not. (Phillips CB, *et al.* Incidence rates of dislocation,

19    pulmonary embolism, and deep infection during the first six months after elective total hip

20    replacement. *American Journal of Bone and Joint Surgery* 2003; 85:20–26.)

21

22         42.     As a direct and proximate result of the failure of her defective Pinnacle Hip

23    and the Defendants' wrongful conduct, Mrs. Lyster sustained and continues to suffer economic

24    damages (including lost wages, medical and hospital expenses), severe and possibly permanent

25    injuries, pain, suffering and emotional distress. As a result, Mrs. Lyster has sustained and will

26    continue to sustain damages in an amount to be proven at trial, but which will far exceed the

27    jurisdictional minimum of this court.

28

SEEGER · SALVAS LLP

EXHIBIT 3 - PAGE 042

1    43.    As a direct and proximate result of the failure of the defective Pinnacle Hip

2    and Defendants' wrongful conduct, Gordon Lyster, Mary Lyster's husband, has been and will

3    continue to be deprived of the consortium, society, comfort, protection, and service of Mary

4    Lyster, thereby causing and continuing to cause Gordon Lyster economic damages, grief, sorrow,

5    mental anguish, emotional distress, and pain and suffering.

6

7                         **FIRST CAUSE OF ACTION**
                              (Strict Product Liability)
8                             Against All Defendants

9    44.    Plaintiffs incorporate by reference paragraphs 1 through 43 of this

10   Complaint as if fully set forth here and further allege as follows:

11

12   45.    Defendants designed, manufactured, promoted, distributed, marketed, and

13   sold the DePuy Pinnacle Hip, including the Pinnacle acetabular cup, the Pinnacle metal liner, and

14   the Atricul/EZE femoral head.

15

16   46.    At all times material hereto, the DePuy Pinnacle Hip that was designed,

17   manufactured, promoted, distributed, marketed, and sold by the Defendants was expected to

18   reach, and did reach, prescribing physicians and consumers, including Mrs. Lyster, without

19   substantial change in the condition in which it was sold.

20

21   47.    At all times material hereto, the DePuy Pinnacle Hip that was designed,

22   manufactured, promoted, distributed, marketed, and sold by the Defendants was in a defective

23   and unreasonably dangerous condition at the time it was placed in the stream of commerce. Such

24   condition included, but is not limited to, one or more of the following particulars:

25

26   (a)    When placed in the stream of commerce, the DePuy Pinnacle Hip

27   contained manufacturing defects, subjecting Mrs. Lyster and others to risks, including the risk

28   that the acetabular component would not properly grow into the bone, causing the hip system to

- 12 -

Complaint

EXHIBIT 3 - PAGE 043

SEEGER · SALVAS LLP

1  prematurely fail and requiring a complex, risky, and painful surgery to remove and replace the

2  defective product;

3

4           (b)     When placed in the stream of commerce, the DePuy Pinnacle Hip

5  contained unreasonably dangerous design defects and was not reasonably safe for the intended

6  use, subjecting Mrs. Lyster and others to risks, including the risk that the acetabular component

7  would not properly grow into the bone, causing the hip system to prematurely fail and requiring a

8  complex, risky, and painful surgery to remove and replace the defective product;

9

10           (c)     The DePuy Pinnacle Hip was insufficiently tested; and/or

11

12           (d)     The DePuy Pinnacle Hip was not accompanied by adequate instructions

13  and/or warnings to fully inform Mrs. Lyster or her physicians of the full nature or extent of the

14  risks associated with its use.

15

16          48.     Defendants knew or should have known of the dangers associated with the

17  use of the DePuy Pinnacle Hip, as well as the defective nature of the DePuy Pinnacle Hip.

18  Despite this knowledge, Defendants continued to manufacture, sell, distribute, promote and

19  supply the DePuy Pinnacle Hip so as to maximize sales and profits at the expense of the public

20  health and safety. Defendants' conduct was done in conscious disregard of the foreseeable harm

21  caused by the DePuy Pinnacle Hip and in conscious disregard for the rights and safety of

22  consumers such as Mrs. Lyster.

23

24          49.     Mrs. Lyster and her doctor used the DePuy Pinnacle Hip as directed for its

25  intended purpose.

26

27          50.     At all times herein mentioned, the DePuy Pinnacle Hip was defective, and

28  Defendants knew that it was to be used by the user without inspection for defects therein.

- 13 -

Complaint

EXHIBIT 3 - PAGE 044

SEEGER · SALVAS LLP

1    Moreover, neither Mrs. Lyster nor her physician knew or had reason to know at the time of the

2    use of the subject products, of the existence of the aforementioned defects. Neither Mrs. Lyster

3    nor her physicians could have discovered the defects in the DePuy Pinnacle Hip through the

4    reasonable exercise of care.

5

6           51.    The DePuy Pinnacle Hip had not been materially altered or modified prior

7    to its implantation in Mrs. Lyster.

8

9           52.    As a direct and proximate result of the failure of the defective DePuy

10   Pinnacle Hip, Plaintiffs suffered the injuries and damages as described herein.

11

12                        **SECOND CAUSE OF ACTION**
                                   (Negligence)
13                             Against All Defendants

14          53.    Plaintiffs incorporate by reference paragraphs 1 through 43 of this

15   Complaint as if fully set forth here and further allege as follows:

16

17          54.    At all times herein mentioned Defendants had a duty to exercise reasonable

18   care in the design, manufacture, testing, inspection, labeling, and sale of the DePuy Pinnacle Hip

19   to ensure that it would be safely used in a manner and for a purpose for which it was made.

20

21          55.    Defendants maliciously, recklessly and/or negligently failed to exercise

22   ordinary care in the design, manufacture, testing, advertising, marketing, and sale of the DePuy

23   Pinnacle Hip.

24

25          56.    Defendants maliciously, recklessly and/or negligently failed in their duty to

26   exercise reasonable care in the provision of an adequate warning to Mrs. Lyster and her

27   physicians as to the risks of the DePuy Pinnacle Hip.

28

                                    - 14 -
                                   Complaint

SEEGER · SALVAS LLP

EXHIBIT 3 - PAGE 045

1        57.    Defendants maliciously, recklessly and/or negligently failed to exercise

2  reasonable care in the post-marketing warnings as to the risks of the DePuy Pinnacle Hip when

3  they knew or should have known of said risks.

4

5        58.    As a result of Defendants' wrongful conduct, Plaintiffs suffered injuries

6  and damages as alleged herein.

7

8                     **THIRD CAUSE OF ACTION**

                      (Breach of Implied Warranties)

9                     Against DePuy and DOES 1 - 10

10        59.    Plaintiffs incorporate by reference paragraphs 1 through 43 of this

11  Complaint as if fully set forth here and further allege as follows:

12

13       60.    Prior to the time that the DePuy Pinnacle Hip was used by Mrs. Lyster,

14  Defendants impliedly warranted to Mrs. Lyster and her physicians that the DePuy Pinnacle Hip

15  was of merchantable quality and safe and fit for the use for which it was intended.

16

17       61.    Mrs. Lyster and her physician were and are unskilled in the research,

18  design and manufacture of the DePuy Pinnacle Hip, and they reasonably relied entirely on the

19  skill, judgment and implied warranty of Defendants in using the DePuy Pinnacle Hip.

20

21       62.    The DePuy Pinnacle Hip was neither safe for its intended use nor of

22  merchantable quality, as warranted by Defendants, in that it had dangerous propensities when put

23  to its intended use and would cause severe injuries to the user.

24

25       63.    Defendants, by selling, delivering and/or distributing the defective DePuy

26  Pinnacle Hip to Mrs. Lyster breached the implied warranty of merchantability and fitness and

27  caused Mrs. Lyster to suffer severe pain and emotional distress, incur medical expenses and incur

28  a loss of earning capacity.

SEEGER · SALVAS LLP

EXHIBIT 3 - PAGE 046

1   64.   As a result of the aforementioned breach of implied warranties by

2   Defendants, Plaintiffs suffered injuries and damages as alleged herein.

3

4                        **FOURTH CAUSE OF ACTION**
                          (Breach of Express Warranty)
5                         Against DePuy and DOES 1 – 10

6   65.   Plaintiffs incorporate by reference paragraphs 1 through 43 of this

7   Complaint as if fully set forth here and further allege as follows:

8

9   66.   At all times herein mentioned, Defendants expressly warranted to Mrs.

10  Lyster and Mrs. Lyster's physicians, by and through statements made by Defendants or their

11  authorized agents or sales representatives, orally and in publications, package inserts and other

12  written materials intended for physicians, medical patients and the general public, that the

13  aforementioned DePuy Pinnacle Hip was safe, effective, fit and proper for its intended use.

14

15  67.   In utilizing the aforementioned DePuy Pinnacle Hip, Mrs. Lyster and her

16  physician relied on the skill, judgment, representations and foregoing express warranties of

17  Defendants.

18

19  68.   Said warranties and representations were false in that the aforementioned

20  DePuy Pinnacle Hip was not safe and was unfit for the uses for which it was intended.

21

22  69.   As a result of the foregoing breach of express warranties by Defendants,

23  Plaintiffs suffered injuries and damages as alleged herein.

24

25

26

27

28

- 16 -

Complaint

SEEGER · SALVAS LLP

EXHIBIT 3 - PAGE 047

1

## FIFTH CAUSE OF ACTION
(Loss of Consortium)
Against All Defendants

2

3       70.     Plaintiff Gordon Lyster incorporates by reference paragraphs 1 through 69

4    of this Complaint as if fully set forth here and further alleges as follows.

5

6       71.     As a direct and proximate result of the failure of the defective DePuy

7    Pinnacle Hip and Defendants' wrongful conduct, Gordon Lyster, Mary Lyster's husband, has

8    been and will continue to be deprived of the consortium, society, comfort, protection, and service

9    of Mary Lyster, thereby causing and continuing to cause Gordon Lyster economic damages, grief,

10   sorrow, mental anguish, emotional distress, and pain and suffering.

11

12                        ## PRAYER FOR RELIEF

13

14          THEREFORE, Plaintiffs demand judgment for the following:

15

16       1.     Past and future medical and incidental expenses, according to proof;

17

18       2.     Past and future loss of earnings and/or earning capacity, according to

19   proof;

20

21       3.     Past and future general damages, according to proof;

22

23       4.     Punitive and exemplary damages in an amount to be determined at trial;

24

25       5.     Prejudgment and post judgment interest;

26

27       6.     Costs to bring this action; and

28

- 17 -

Complaint

EXHIBIT 3 - PAGE 048

7.     Such other and further relief as the court may deem just and proper.

DATED:  March 9, 2010.                    SEEGER ● SALVAS LLP


                                          By _____
                                             Brian J. Devine
                                             Attorneys for Plaintiffs Mary Lyster and
                                             Gordon Lyster

SEEGER · SALVAS LLP

- 18 -

Complaint

EXHIBIT 3 - PAGE 049

**Superior Court of California, County of Contra Costa**

## NOTICE TO PLAINTIFFS
In Unlimited Jurisdiction Civil Actions

### AFTER YOU FILE YOUR COURT CASE:

1. Have the forms the clerk gives you served on all defendants in this case:
   a. The Complaint
   b. The Summons
   c. The Notice of Case Management Conference (shows hearing date and time)
   d. The Notice to Defendants (Local Court Form CV-655d)
   e. Blank: Case Management Statement (Judicial Council Form CM-110)
   f. Blank: Stipulation and Order to Attend ADR and Delay First Case Management Conference 90 Days (Local Court Form CV-655b)
   g. Alternative Dispute Resolution (ADR) Information (Local Court Form CV-655c)

2. Within 60 days of the date you filed the complaint you must prove that the forms have been served on (delivered to) the defendants correctly by filing the *Proof of Service* form (POS-010) (completed by the person who did the service) with the court.

3. Go to the case management conference on the date indicated on The Notice of Case Management Conference.

4. Consider using mediation, arbitration, or neutral case evaluation (ADR) to resolve the dispute. All parties must answer questions about ADR on the *Case Management Statement* form. For more information, see the enclosed ADR information, visit www.cc-courts.org/edr , or call (925) 957-5787.

5. You may delay the first case management conference while you try to resolve the dispute in ADR. If all parties agree to use ADR, complete and file the Stipulation and Order to Attend ADR and Continue First Case Management Conference 90 Days form to tell the court you want to use this option.

All civil actions *(except juvenile, probate, family, unlawful detainer, extraordinary writ, and asset forfeiture[1])* and personal injury cases where a party is claiming damages[2] must meet the Civil Trial Delay Reduction time limits for filing documents and moving their cases forward. These time limits are listed in California Rule of Court 3.110 and Local Court Rule 5. If parties miss these deadlines, a judge might issue an order *(Order to Show Cause)* for them to explain in court why they should not have to pay a fine or have their case dismissed.

### VIEW LOCAL COURT RULES AT: (WWW.CC-COURTS.ORG/RULES)

---

[1] *Health and Safety Code §11470 et seq.*
[2] *Including claims for emotional distress and/or wrongful death.*
CV-655a/Rev. 07/25/2007
Packet Revised 1/1/09

EXHIBIT 3 - PAGE 050

### Superior Court of California, County of Contra Costa

## NOTICE TO DEFENDANTS
### In Unlimited Jurisdiction Civil Actions

YOU ARE BEING SUED. The packet you have been served should contain:

- a.    The Summons
- b.    The Complaint
- c.    The Notice of Case Management (shows hearing date and time)
- d.    Blank: Case Management Statement (Judicial Council Form CM-110)
- e.    Blank: Stipulation and Order to Attend ADR and Delay First Case Management Conference 90 Days (Local Court Form CV-655b)
- f.    Alternative Dispute Resolution (ADR) Information  (Local Court Form CV-655c)

---

 **WHAT DO I DO NOW?** 

**You must:**

1. **Prepare your response**    YOU COULD LOSE YOUR CASE—even before it is heard by a judge or before you can defend yourself, if you do not prepare and file a response on time. See the other side of this page for types of responses you can prepare.

2. **Complete the** *Case Management Statement*  *(CM-110)*

3. **File and serve your court papers on time**    Once your court forms are complete, you must file 1 original and 2 copies of the forms at court. An adult who is NOT involved in your case must serve one set of forms on the Plaintiff. If you were served in person you must file your response in 30 days. If the server left a copy of the papers with an adult living at your home or an adult in charge at your work or you received a copy by mail you must file your response in 40 days.

4. **Prove you served your court papers on time**    by having your server complete a *Proof of Service, (Judicial Council form POS-040)*, that must be filed at the court within 60 days.

5. **Go to court on the date and time given in the** *Notice of Case Management Conference.*

6. **Consider trying to settle your case before trial**    If you and the other party to the case can agree to use mediation, arbitration or neutral case evaluation, the *Stipulation and Order to Attend ADR and Delay First Case Management Conference 90 Days* can be filed with your other papers. For more information read the enclosed ADR information, visit www.cc-courts.org/adr, or call (925) 957-5787.

**IMPORTANT! The court recommends consulting an attorney for all or part of your case. While you may represent yourself, lawsuits can be complicated, and the court cannot give you legal advice.**

---

**COURT FEES:** You must pay court fees the first time you file your papers. If you also file a motion, you must pay another fee. If you cannot afford the fees, you may ask the court to waive (allow you not to pay) fees. Use Judicial Council forms FW-001-INFO [information sheet]; FW-001 [application]; and FW-003 [order].

**COURT FORMS:** Buy forms at the Forms Window in the Family Law Building or download them for free at:
www.courtinfo.ca.gov/forms/

CV-655c/Rev. 11/05/2007

**EXHIBIT 3 - PAGE 051**

---

## WHAT KIND OF RESPONSES CAN I FILE?

1. If you disagree with some or all of what the plaintiff says in the complaint because you believe, or know it is not true, you can file an ANSWER.
2. If you have a claim in the same case against the plaintiff, you may file a CROSS-COMPLAINT.
3. If you want to ask the court to do something on your behalf, you may file a MOTION (See TYPES OF MOTIONS below)

---

## HOW DO I PREPARE AN ANSWER?

There are two kinds of Answers you can use, depending on whether the Complaint was verified. You can tell if a Complaint is verified because it says "Verified Complaint" and/or has a signed oath on the last page.

For complaints that are NOT verified:

Use Judicial Council form PLD-050 – General Denial

For complaints that ARE verified:

    a. For personal injury, property damage, and wrongful death claims, use Judicial Council PLD-PI-003 (do not check number 2).

    b. For contract claims, use Judicial Council PLD-C-010 (do not check number 3a).

    c. Be sure to deny every claim with which you disagree. For example, you might write: "I believe, or know, that the information in paragraph #__ is untrue/incorrect." Continue your list until you have addressed each paragraph in the Complaint.

NOTE: The Judicial Council Answer forms have spaces for your affirmative defenses. Be sure to include them or you may not be able to use them later. To find out what your affirmative defenses might be, go to the law library and ask the librarian to help you find the information you need.

If you want to file a Cross-Complaint, you must do so at the same time you file the Answer.

    a. For a personal injury, property damage, and/or wrongful death Cross-Complaint, use Judicial Council form PLD-PI-002.

    b. For a contract Cross-Complaint, use Judicial Council PLD-C-001.

---

## TYPES OF MOTIONS

Written motions are documents that ask the court to do something. You may have to file an *Answer* at the same time. At this point in the case, you can only make Motions from the following list:

1. Demurrer *(the facts stated in the complaint are wrong, or the deadline to file the lawsuit has passed)*;
2. Motion to Strike *(the complaint is unclear; does not follow the law, "doesn't matter", etc.)*;
3. Motion to Transfer *(the complaint is in the wrong court or there's a more appropriate court)*;
4. Motion to Quash Service of Summons *(you were not legally served)*;
5. Motion to Stay *(put the case on hold)*; or
6. Motion to Dismiss *(stops the case)*.

    NOTE: Motions are very complicated and you may want to hire a lawyer to help you.

---

## WHERE CAN I GET MORE HELP?

- Lawyer Referral Service: (925) 825-5700
- Bay Area Legal Aid: (800) 551-5554
- Contra Costa County Law Library    Martinez: (925) 646-2783        Richmond: (510) 374-3019
- Ask the Law Librarian: www.247ref.org/portal/access_law3.cfm

EXHIBIT 3 - PAGE 052

# SUPERIOR COURT OF THE STATE OF CALIFORNIA
## IN AND FOR THE COUNTY OF CONTRA COSTA

_____
Plaintiff(s) / Cross Plaintiff(s)

vs.

_____

_____
Defendant(s) / Cross Defendant(s)

### ADR Case Management Stipulation and Order
(Unlimited Jurisdiction Civil Cases)

CASE NO.: _____

> ► ALL PARTIES STIPULATING TO ADR AND DELAYING THEIR CASE MANAGEMENT CONFERENCE 90 DAYS MUST SUBMIT THE ORDER FOR THE JUDGE'S SIGNATURE AND FILE THIS FORM AT LEAST 15 DAYS BEFORE THEIR CASE MANAGEMENT CONFERENCE. (NOT AVAILABLE IN COMPLEX LITIGATION CASES.)
> ► PARTIES MUST ALSO SEND A COPY OF THIS FILED STIPULATION AND ORDER TO THE ADR OFFICE: FAX: (925) 957-5689 MAIL: P.O. BOX 911, MARTINEZ, CA 94553

Counsel and all parties agree to delay their case management conference 90 days to attend ADR and complete pre-ADR discovery as follows:

1. Selection and scheduling for Alternative Dispute Resolution (ADR):
   a. The parties have agreed to ADR as follows:
      I. ☐ Mediation (☐ Court-connected ☐ Private)
      II. ☐ Arbitration (☐ Judicial Arbitration (non-binding) ☐ Private (non-binding) ☐ Private (binding))
      III. ☐ Neutral case evaluation
   b. The ADR neutral shall be selected by (date): _____ (no more than 14 days after filing this form)
   c. ADR shall be completed by (date): _____ (no more than 90 days after filing this form)
2. The parties will complete the following discovery plan:
   a. ☐ Written discovery: (☐ Additional page(s) attached)
      I. ☐ Interrogatories to: _____
      II. ☐ Request for Production of Documents to: _____
      III. ☐ Request for Admissions to: _____
      IV. ☐ I
      v. Independent Medical Evaluation of: _____
      vi. ☐ Other: _____
   b. ☐ Deposition of the following parties or witnesses: (☐ Additional page(s) attached)
      I. _____
      II. _____
      III. _____
   c. ☐ No Pre-ADR discovery needed
3. The parties also agree: _____
4. Counsel and self-represented parties represent they are familiar with and will fully comply with all local court rules related to ADR as provided in Appendix C, will pay the fees associated with these services, and understand that if they do not, without good cause, comply with this stipulation and all relevant local court rules, they may be subject to sanctions.

| Counsel for Plaintiff (print) | Fax | Counsel for Defendant (print) | Fax |
|---|---|---|---|
| Signature | | Signature | |
| Counsel for Plaintiff (print) | Fax | Counsel for Defendant (print) | Fax |
| Signature | | Signature | |

Pursuant to the Stipulation of the parties, and subject to the *Case Management Order* to be filed, IT IS SO ORDERED that the Case Management Conference set for _____ is vacated and rescheduled for _____ at (8:30 a.m. / _____) Plaintiff/ Plaintiff's counsel must notify all parties of the new case management conference.

Dated: _____            _____
                                    Judge of the Superior Court

CV-655b/Rev. 12/2006                Local Court Rules, Rule 5 (h)(1)(a)(3)

EXHIBIT 3 - PAGE 053

CM-110

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| | |

TELEPHONE NO.:         FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

SUPERIOR COURT OF CALIFORNIA, COUNTY OF
  STREET ADDRESS:
  MAILING ADDRESS:
  CITY AND ZIP CODE:
  BRANCH NAME:

PLAINTIFF/PETITIONER:

DEFENDANT/RESPONDENT:

| **CASE MANAGEMENT STATEMENT** | CASE NUMBER: |
|---|---|
| (Check one): ☐ **UNLIMITED CASE**    ☐ **LIMITED CASE** <br> (Amount demanded      (Amount demanded is $25,000 <br> exceeds $25,000)       or less) | |

**A CASE MANAGEMENT CONFERENCE is scheduled as follows:**
Date:            Time:         Dept.:         Div.:        Room:
Address of court *(if different from the address above):*

☐ Notice of Intent to Appear by Telephone, by *(name):*

**INSTRUCTIONS: All applicable boxes must be checked, and the specified information must be provided.**

1. Party or parties *(answer one):*
   a. ☐ This statement is submitted by party *(name):*
   b. ☐ This statement is submitted jointly by parties *(names):*

2. Complaint and cross-complaint *(to be answered by plaintiffs and cross-complainants only)*
   a. The complaint was filed on *(date):*
   b. ☐ The cross-complaint, if any, was filed on *(date):*

3. Service *(to be answered by plaintiffs and cross-complainants only)*
   a. ☐ All parties named in the complaint and cross-complaint have been served, or have appeared, or have been dismissed.
   b. ☐ The following parties named in the complaint or cross-complaint
       (1) ☐ have not been served *(specify names and explain why not):*

       (2) ☐ have been served but have not appeared and have not been dismissed *(specify names):*

       (3) ☐ have had a default entered against them *(specify names):*

   c. ☐ The following additional parties may be added *(specify names, nature of involvement in case, and the date by which they may be served):*

4. Description of case
   a. Type of case in ☐ complaint ☐ cross-complaint *(Describe, including causes of action):*

Form Adopted for Mandatory Use
Judicial Council of California
CM-110 [Rev. January 1, 2009]

**CASE MANAGEMENT STATEMENT**

Cal. Rules of Court,
rules 3.720–3.730
www.courtinfo.ca.gov

EXHIBIT 3 - PAGE 054

**CM-110**

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

4. b. Provide a brief statement of the case, including any damages. *(If personal injury damages are sought, specify the injury and damages claimed, including medical expenses to date (indicate source and amount), estimated future medical expenses, lost earnings to date, and estimated future lost earnings. If equitable relief is sought, describe the nature of the relief.)*

☐ *(If more space is needed, check this box and attach a page designated as Attachment 4b.)*

5. **Jury or nonjury trial**
The party or parties request ☐ a jury trial ☐ a nonjury trial. *(If more than one party, provide the name of each party requesting a jury trial):*

6. **Trial date**
   a. ☐ The trial has been set for *(date):*
   b. ☐ No trial date has been set. This case will be ready for trial within 12 months of the date of the filing of the complaint *(if not, explain):*

   c. ☐ Dates on which parties or attorneys will not be available for trial *(specify dates and explain reasons for unavailability):*

7. **Estimated length of trial**
The party or parties estimate that the trial will take *(check one):*
   a. ☐ days *(specify number):*
   b. ☐ hours (short causes) *(specify):*

8. **Trial representation** *(to be answered for each party)*
The party or parties will be represented at trial ☐ by the attorney or party listed in the caption ☐ by the following:
   a. Attorney:
   b. Firm:
   c. Address:
   d. Telephone number:
   e. Fax number:
   f. E-mail address:
   g. Party represented:
   ☐ Additional representation is described in Attachment 8.

9. **Preference**
   ☐ This case is entitled to preference *(specify code section):*

10. **Alternative Dispute Resolution (ADR)**
   a. Counsel ☐ has ☐ has not provided the ADR information package identified in rule 3.221 to the client and has reviewed ADR options with the client.
   b. ☐ All parties have agreed to a form of ADR. ADR will be completed by *(date):*
   c. ☐ The case has gone to an ADR process *(indicate status):*

**EXHIBIT 3 - PAGE 055**

CM-110

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: | |

10. d. The party or parties are willing to participate in *(check all that apply):*
    (1) ☐ Mediation
    (2) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to close 15 days before arbitration under Cal. Rules of Court, rule 3.822)
    (3) ☐ Nonbinding judicial arbitration under Code of Civil Procedure section 1141.12 (discovery to remain open until 30 days before trial; order required under Cal. Rules of Court, rule 3.822)
    (4) ☐ Binding judicial arbitration
    (5) ☐ Binding private arbitration
    (6) ☐ Neutral case evaluation
    (7) ☐ Other *(specify):*

  e. ☐ This matter is subject to mandatory judicial arbitration because the amount in controversy does not exceed the statutory limit.
  f. ☐ Plaintiff elects to refer this case to judicial arbitration and agrees to limit recovery to the amount specified in Code of Civil Procedure section 1141.11.
  g. ☐ This case is exempt from judicial arbitration under rule 3.811 of the California Rules of Court *(specify exemption):*

11. **Settlement conference**
  ☐ The party or parties are willing to participate in an early settlement conference *(specify when):*

12. **Insurance**
  a. ☐ Insurance carrier, if any, for party filing this statement *(name):*
  b. Reservation of rights: ☐ Yes ☐ No
  c. ☐ Coverage issues will significantly affect resolution of this case *(explain):*

13. **Jurisdiction**
  Indicate any matters that may affect the court's jurisdiction or processing of this case, and describe the status.
  ☐ Bankruptcy ☐ Other *(specify):*
  Status:

14. **Related cases, consolidation, and coordination**
  a. ☐ There are companion, underlying, or related cases.
    (1) Name of case:
    (2) Name of court:
    (3) Case number:
    (4) Status:
  ☐ Additional cases are described in Attachment 14a.
  b. ☐ A motion to ☐ consolidate ☐ coordinate will be filed by *(name party):*

15. **Bifurcation**
  ☐ The party or parties intend to file a motion for an order bifurcating, severing, or coordinating the following issues or causes of action *(specify moving party, type of motion, and reasons):*

16. **Other motions**
  ☐ The party or parties expect to file the following motions before trial *(specify moving party, type of motion, and issues):*

CM-110 [Rev. January 1, 2009]          **CASE MANAGEMENT STATEMENT**          Page 3 of 4

EXHIBIT 3 - PAGE 056

| | CM-110 |
|---|---|
| PLAINTIFF/PETITIONER: | CASE NUMBER: |
| DEFENDANT/RESPONDENT: | |

**17. Discovery**
- a. ☐ The party or parties have completed all discovery.
- b. ☐ The following discovery will be completed by the date specified (describe all anticipated discovery):

| Party | Description | Date |
|---|---|---|

- c. ☐ The following discovery issues are anticipated (specify):

**18. Economic litigation**
- a. ☐ This is a limited civil case (i.e., the amount demanded is $25,000 or less) and the economic litigation procedures in Code of Civil Procedure sections 90 through 98 will apply to this case.
- b. ☐ This is a limited civil case and a motion to withdraw the case from the economic litigation procedures or for additional discovery will be filed (if checked, explain specifically why economic litigation procedures relating to discovery or trial should not apply to this case):

**19. Other issues**
- ☐ The party or parties request that the following additional matters be considered or determined at the case management conference: (specify):

**20. Meet and confer**
- a. ☐ The party or parties have met and conferred with all parties on all subjects required by rule 3.724 of the California Rules of Court (if not, explain):

- b. ☐ After meeting and conferring as required by rule 3.724 of the California Rules of Court, the parties agree on the following (specify):

**21. Total number of pages attached (if any):**

I am completely familiar with this case and will be fully prepared to discuss the status of discovery and ADR, as well as other issues raised by this statement, and will possess the authority to enter into stipulations on these issues at the time of the case management conference, including the written authority of the party where required.

Date:

_____
(TYPE OR PRINT NAME)                (SIGNATURE OF PARTY OR ATTORNEY)

_____
(TYPE OR PRINT NAME)                (SIGNATURE OF PARTY OR ATTORNEY)

☐ Additional signatures are attached.

CM-110 [Rev. January 1, 2009]         **CASE MANAGEMENT STATEMENT**         Page 4 of 4

**EXHIBIT 3 - PAGE 057**



## CONTRA COSTA COUNTY SUPERIOR COURT
## ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION

All judges in the Civil Trial Delay Reduction Program agree that parties should consider using Alternative Dispute Resolution (ADR) to settle their cases. To tell the court you will use ADR:

- Choose ADR on the *Case Management Form* (CM-110);
- File a *Stipulation and Order to Attend ADR and Continue First Case Management Conference 90-Days* (local court form); or
- Agree to ADR at your first court appearance.

*Questions?* Call (925) 957-5787, or go to www.cc-courts.org/adr

### MEDIATION

Mediation is often faster and less expensive than going to trial. Mediators help people who have a dispute talk about ways they can settle their case. Parties call or visit the ADR Programs office to get a list of mediators. After parties have agreed on a mediator, they must write a summary (5 pages or less) explaining the facts, legal arguments, and legal authority for their position. They must send this summary to the other parties and the mediator at least 5 court days before mediation starts.

ALL parties and attorneys must go to mediation. Mediation can be held whenever and wherever the parties and the mediator want, as long as they finish before the court deadline. In some kinds of court cases, parties have the chance to mediate in the courthouse on their trial day.

Most mediators begin by talking with the parties together, helping them focus on the important issues. The mediator may also meet with each party alone. Mediators often ask parties for their ideas about how to settle the case. Some mediators tell the parties how much money they think a case is worth, or tell them what they think might happen if the case went to trial. Other mediators help the parties decide these things for themselves. No matter what approach a mediator takes, decisions about settling a case can only be made when all the parties agree.

If the parties go through the court ADR program, mediators do not charge fees for the first half hour spent scheduling or preparing for mediation. They also do not charge fees for the first two hours of mediation. If parties need more time, they must pay that person's regular fees. Some mediators ask for a deposit before mediation starts. Mediators who do this must give back whatever is left after counting the time he or she spent preparing for or doing the mediation. A party whose court fees have been waived (cancelled) may ask if their mediation fees or deposit can be waived.

If parties agree about how they will settle their case, they can choose to keep it private, write it up as a contract, or ask the judge to make it a court order. What parties say and agree to in mediation is confidential (private).

### PRIVATE MEDIATION

Private mediation works in the same way as judicial mediation, but the parties do not go through the ADR Programs office. Parties choose a mediator on their own, and pay the mediator's normal fees.

CV-655c/Rev. 11/05/2007

EXHIBIT 3 - PAGE 058

## JUDICIAL ARBITRATION (non-binding)

In judicial arbitration, an independent attorney (arbitrator) looks at the evidence, listens to the parties and their witnesses, and decides how the case will be settled. Judicial arbitration is less formal than court. Parties call or visit the ADR Programs office to get a list of arbitrators. If they cannot agree on an arbitrator, the court will assign one. The judge can send cases to arbitration if there is less than $50,000 in dispute. The person who started the court case can make sure the case goes to arbitration if they agree to limit the amount they are asking for to $50,000. Parties can also agree they want to use judicial arbitration. The arbitrator must send their decision (award) to the court within 10 days of the last hearing. The award becomes a court judgment unless a party asks the court to review the case within 30 days. Parties must use the ADR 102 form to ask for a new court hearing (called a trial de novo.) Judicial arbitrators charge $150 per case or per day.

## PRIVATE ARBITRATION (non-binding and binding)

Private, non-binding arbitration is the same as judicial arbitration, except that the parties do not go through the ADR Programs office to choose an arbitrator, and the arbitrator's award will not become a judgment of the court unless all parties agree. Parties must pay the arbitrator's normal fees.

Binding arbitration is different from judicial and private non-binding arbitration because the arbitrator's decision is final. Parties give up their right to have a judge review their case later (except for reasons listed in California Code of Civil Procedure, Section 1286.2.) Binding arbitration rules are listed in California Code of Civil Procedure, Sections 1280-1288.8. Parties may also agree any time before the judge has made a decision that ends the case to switch to binding arbitration. Parties choose the arbitrator on their own, and must pay the arbitrator's normal (not $150) fees.

## SETTLEMENT MENTOR CONFERENCE

Settlement mentors are independent, experienced trial attorneys that a judge has assigned to help parties look for ways to settle their case. The conference is free and is held in the courthouse. It is often held on the morning of trial, but it can be scheduled anytime. These conferences usually last two or three hours. Parties do not present evidence and do not call witnesses. Parties can ask the settlement mentor to keep some information confidential (private) from the other party, but not from the judge. The settlement mentor can share any information with the judge, or involve the judge in settlement discussions. All principals, clients, and claims representatives must attend the settlement mentor conference.

## NEUTRAL CASE EVALUATION

In neutral case evaluation, an independent attorney (evaluator) reviews documents and listens to each party's side of the case. The evaluator then tells the parties what they think could happen if the case went to trial. Many people use the evaluator's opinion to reach an agreement on their own, or use this information later in mediation or arbitration to settle their case.

Parties call or visit the ADR Programs office to get a list of evaluators. After parties have agreed on an evaluator, they must write a summary (5 pages or less) explaining the facts, legal arguments, and legal authority for their position. They must send this summary to the other parties and the evaluator at least 5 court days before evaluation starts. ALL parties and their attorneys must go to neutral case evaluation. The evaluation can be held whenever and wherever the parties and the evaluator want, as long as they finish before the court deadline. If the parties go through the court's ADR program, evaluators do not charge any fees for the first half hour spent scheduling or preparing for the evaluation conference. They also do not charge fees for the first two hours of the evaluation. If parties need more time, they must pay that person's regular fees. Some evaluators ask for a deposit before evaluation starts. Evaluators who do this must give back whatever is left after counting the time he or she spent preparing for or doing the evaluation. A party whose court fees have been waived (cancelled) may ask if their evaluation fees or deposit can be waived.

EXHIBIT 3 - PAGE 059

## TEMPORARY JUDGE

Some parties want a trial, but want to choose who will decide the case and when the trial will take place. Parties can agree on an attorney that they want the court to appoint as a temporary judge for their case. (See Article 6, Section 21 of the State Constitution and Rule 2.830 of the California Rules of Court.) Temporary judges have nearly the same authority as a superior court judge to conduct a trial and make decisions. As long as the parties meet the court deadline, they can schedule the trial at their own and the temporary judge's convenience.

Each of the temporary judges on the court's panel has agreed to serve at no charge for up to 5 court days. If the parties need more time, they must pay that person's regular fees. All parties and their lawyers must attend the trial, and provide a copy of all briefs or other court documents to the temporary judge at least two weeks before the trial. These trials are similar to other civil trials, but are usually held outside the court. The temporary judge's decision can be appealed to the superior court. There is no option for a jury trial. The parties must provide their own court reporter.

## SPECIAL MASTER

A special master is a private lawyer, retired judge, or other expert appointed by the court to help make day-to-day decisions in a court case. The special master's role can vary, but often includes making decisions that help the discovery (information exchange) process go more smoothly. He or she can make decisions about the facts in the case. Special masters can be especially helpful in complex cases. The trial judge defines what the special master can and cannot do in a court order.

Special masters often issue both interim recommendations and a final report to the parties and the court. If a party objects to what the special master decides or reports to the court, that party can ask the judge to review the matter. In general, the parties choose (by stipulation) whom they want the court to appoint as the special master, but there are times (see California Code of Civil Procedure Section 639), when the court may appoint a special master or referee without the parties' agreement. The parties are responsible to pay the special master's regular fees.

## COMMUNITY MEDIATION SERVICES

Mediation Services are available through non-profit community organizations. These low-cost services are provided by trained volunteer mediators. For more information about these programs contact the ADR Program at (925) 957-5787

EXHIBIT 3 - PAGE 060

SUM-100

# SUMMONS
## (CITACION JUDICIAL)



FOR COURT USE ONLY

FILED

2011 MAR 10 A 9 42

K. TORRE CLERK OF THE SUPERIOR COURT
COUNTY OF CONTRA COSTA, CALIF.

BY: A. Nuesto, Deputy Clerk

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
DEPUY ORTHOPAEDICS, INC., THOMAS P. SCHMALZRIED, M.D. A
PROFESSIONAL CORPORATION, and DOES 1 through 20, inclusive,

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MARY LYSTER and GORDON LYSTER

---

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is: *(El nombre y dirección de la corte es):* CONTRA COSTA COUNTY SUPERIOR COURT 725 COURT STREET MARTINEZ, CA 94553 | **CASE NUMBER:** *(Número del Caso):* **C 11 - 00570** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
BRIAN J. DEVINE / SEEGER SALVAS LLP                    Telephone No.: (415) 981-9260
455 MARKET ST., SUITE 1530 / SAN FRANCISCO, CA 94105   Fax No.: (415) 981-9266

| DATE: MAR 10 2011 | Clerk, by | A. NUESTRO | , Deputy |
|---|---|---|---|
| *(Fecha)* | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation)        ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

| Form Adopted for Mandatory Use Judicial Council of California SUM-100 [Rev. July 1, 2009] | **SUMMONS** | Code of Civil Procedure §§ 412.20, 465 www.courtinfo.ca.gov LexisNexis® Automated California Judicial Council Forms |
|---|---|---|

**EXHIBIT 3 - PAGE 061**

SUPERIOR COURT – MA...INEZ
COUNTY OF CONTRA COSTA
MARTINEZ, CA, 94553

LYSTER ET AL VS DEPUY ORTHOPAEDICS ET AL

NOTICE OF CASE MANAGEMENT CONFERENCE                    CIVMSC11-00570

1.   NOTICE: THE CASE MANAGEMENT CONFERENCE HAS BEEN SCHEDULED FOR:

DATE:  07/28/11        DEPT:  19        TIME:  8:30⁻

THIS FORM, A COPY OF THE NOTICE TO PLAINTIFFS, THE ADR INFORMATION
SHEET, A BLANK CASE MANAGEMENT CONFERENCE QUESTIONNAIRE, AND A BLANK
STIPULATION FORM ARE TO BE SERVED ON OPPOSING PARTIES.  ALL PARTIES
SERVED WITH SUMMONS AND COMPLAINT/CROSS-COMPLAINT OR THEIR ATTORNEY
OF RECORD MUST APPEAR.

2.  You may stipulate to an earlier Case Management Conference.  If
all parties agree to an early Case Management Conference, please
contact the Court Clerk's Office at (925)957-5794 for Unlimited Civil
cases and (925)957-5791 for Limited Civil cases for assignment of an
earlier date.

3.  You must be familiar with the case and be fully prepared to par-
ticipate effectively in the Case Management Conference and to discuss
the suitability of this case for the EASE Program, private mediation,
binding or non-binding arbitration, and/or use of a Special Master.

4.  At any Case Management Conference the court may make pretrial
orders including the following:

   a.  an order establishing a discovery schedule
   b.  an order referring the case to arbitration
   c.  an order transferring the case to limited jurisdiction
   d.  an order dismissing fictitious defendants
   e.  an order scheduling exchange of expert witness information
   f.  an order setting subsequent conference and the trial date
   g.  an order consolidating cases
   h.  an order severing trial of cross-complaints or bifurcating
       issues
   i.  an order determining when demurrers and motions will be filed

                              SANCTIONS
If you do not file the Case Management Conference Questionnaire or
attend the Case Management Conference or participate effectively in
the Conference, the court may impose sanctions (including dismissal of
the case and payment of money).

        Clerk of the Superior Court of Contra Costa County
I declare under penalty of perjury that I am not a party to this
action, and that I delivered or mailed a copy of this notice to the
person representing the plaintiff/cross-complainant.

Dated:  03/10/11                    _____A. NUESTRO_____
                                    A. NUESTRO, Deputy Clerk

EXHIBIT 3 - PAGE 062

1    **PROOF OF SERVICE**

2    **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3        At the time of service, I was over 18 years of age and **not a party to this action**. I am
employed in the County of Los Angeles, State of California. My business address is 355 South
4    Grand Avenue, Fifteenth Floor, Los Angeles, California 90071-1560.

5        On April 8, 2011, I served true copies of the following document(s) described as **NOTICE
OF REMOVAL OF ACTION UNDER 28 U.S.C. SECTION 1441(B) (DIVERSITY)** on the
6    interested parties in this action as follows:

7    Kenneth M. Seeger                   Attorneys for Plaintiffs
Brian J. Devine
8    SEEGER • SALVAS LLP
455 Market Street, Suite 1530       T:   (415) 981-9260
9    San Francisco, CA  94105           F:   (415) 981-9266

10

11    **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons
at the addresses listed in the Service List and placed the envelope for collection and mailing,
following our ordinary business practices. I am readily familiar with Yukevich Calfo &
12    Cavanaugh's practice for collecting and processing correspondence for mailing. On the same day
that the correspondence is placed for collection and mailing, it is deposited in the ordinary course
13    of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

14        I declare under penalty of perjury under the laws of the United States of America that the
foregoing is true and correct and that I am employed in the office of a member of the bar of this
15    Court at whose direction the service was made.

16        Executed on April 8, 2011, at Los Angeles, California.

17

18    _____
Deanna Castellanos
19

20

535130.1 / 25-055

1  ALEXANDER G. CALFO (SBN 152891)
   *ACalfo@yukelaw.com*
2  KELLEY S. OLAH (SBN 245180)
   *KOlah@yukelaw.com*
3  YUKEVICH CALFO & CAVANAUGH
   355 S. Grand Avenue, 15th Floor
4  Los Angeles, CA 90071-1560
   Telephone:    (213) 362-7777
5  Facsimile:    (213) 362-7788

6  Attorneys for Defendant
   DEPUY ORTHOPAEDICS, INC.
7

8              **UNITED STATES DISTRICT COURT**

9    **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

10

11 | MARY LYSTER and GORDON LYSTER,  | CASE NO.
12 |                 Plaintiffs,     | **DEFENDANT DEPUY ORTHOPAEDICS, INC.'S NOTICE OF MOTION AND MOTION FOR STAY; MEMORANDUM OF POINTS AND AUTHORITIES**
13 |        vs.                      |
14 | DEPUY ORTHOPAEDICS, INC.,       | **JURY TRIAL DEMANDED**
   | THOMAS P. SCHMALZRIED, M.D.
15 | A PROFESSIONAL CORPORATION,
   | and DOES 1 through 20, inclusive
16 |
   |                 Defendants.
17

18

19          **DEFENDANT'S MOTION AND MEMORANDUM OF LAW**
20                **IN SUPPORT OF MOTION TO STAY**

21      Defendant DePuy Orthopaedics, Inc. ("DePuy") respectfully moves this Court to stay all

22 proceedings in this action pending resolution of a pending motion before the Judicial Panel on

23 Multidistrict Litigation (the "Panel" or "MDL Panel") seeking establishment of a multi-district

24 litigation ("MDL") proceeding, coordinating all federal cases in which plaintiffs allege that they

25 suffered personal injuries as a result of implantation of a Pinnacle Acetabular Cup System

26 ("Pinnacle ACS") manufactured by DePuy. As set forth below, a stay of proceedings in this case

27 is necessary and appropriate to achieve the judicial economies that underlie Section 1407.

28 ///

535317.1 / 25-054

1

## BACKGROUND

2          This action was filed on or about March 10, 2011, in the Superior Court of Contra Costa

3   County, California. In this action, plaintiffs claim that Mrs. Lyster was injured as a result of being

4   implanted with a Pinnacle ACS. *(See, e.g.,* Compl. ¶¶ 34-43.) DePuy removed the case to this

5   Court on April 8, 2011. *(See* Dkt. No. 1.)

6          On March 23, 2011, a plaintiff in a Pinnacle ACS action pending in the United States

7   District Court for the Central District of California moved the Panel for creation of an MDL

8   proceeding to coordinate the Pinnacle ACS cases that are now pending in federal courts around the

9   country. *(See* Brief In Supp. Of Pl.'s Mot. For Transfer Of Actions Pursuant To 28 U.S.C. § 1407

10  (attached as Ex. 1).) DePuy supports establishment of such a proceeding – and intends to inform

11  the Panel next week that there are now at least 30 Pinnacle ACS cases pending in federal district

12  court. DePuy believes that establishment of an MDL proceeding is almost certain since the Panel

13  has established product-liability proceedings with far fewer cases than are pending here. *See, e.g.,*

14  *In re Budeprion XL Mktg. & Sales Practices Litig.*, 657 F. Supp. 2d 1373 (J.P.M.L. 2009)

15  (coordinating six actions); *In re NuvaRing Prods. Liab. Litig.*, 572 F. Supp. 2d 1382 (J.P.M.L.

16  2008) (coordinating eleven actions); *In re Pamidronate Prods. Liab. Litig.*, 657 F. Supp. 2d 1368

17  (J.P.M.L. 2009) (coordinating nine actions); *In re Denture Cream Prods. Liab. Litig.*, 624 F. Supp.

18  2d 1379, 1380 (J.P.M.L. 2009) (coordinating twelve actions); *In re Zurn Pex Plumbing Prods.*

19  *Liab. Litig.*, 572 F. Supp. 2d 1380, 1381 (J.P.M.L. 2008) (coordinating three actions).

20

## ARGUMENT

21          Courts generally analyze two factors when determining whether a stay is appropriate

22  pending likely transfer of a case to an MDL proceeding. First, courts consider "the judicial

23  resources that would be saved by avoiding duplicative litigation" if the case is transferred to an

24  MDL court – i.e., efficiency. *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal.

25  1997). Second, courts weigh the "hardship and inequity to the moving party if the action is not

26  stayed" against the "potential prejudice to the non-moving party" if the stay is granted – i.e.,

27  fairness. *Id.* Both factors weigh in favor of a stay here.

28  / / /

535317.1 / 25-054
                                           2
DEFENDANT DEPUY ORTHOPAEDICS, INC.'S NOTICE OF MOTION AND MOTION FOR STAY;
MEMORANDUM OF POINTS AND AUTHORITIES

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

**I.    A STAY WOULD MAXIMIZE EFFICIENCY.**

First, granting a stay will undoubtedly promote judicial economy. The explicit purpose of multidistrict litigation is to coordinate the pretrial management of actions sharing common issues in a "just and efficient" manner. 28 U.S.C. § 1407(a). Allowing an action that overlaps with others that are part of a potential MDL proceeding to proceed while the MDL Panel makes a determination on transfer would undermine that purpose. *See, e.g., Rivers*, 980 F. Supp. at 1360 (absent a stay, "this Court will have needlessly expended its energies familiarizing itself with the intricacies of a case that would be heard by another judge"). By contrast, granting a stay of this action pending its likely transfer to an MDL proceeding will conserve the Court's resources and prevent duplicative discovery and pretrial management efforts. *See Cottle-Banks v. Cox Communs., Inc.*, No. 10cv2133 BTM(WVG), 2010 U.S. Dist. LEXIS 138195, at *2 (S.D. Cal. Dec. 30, 2010) ("The Court finds that a stay of this case pending a transfer decision by the MDL Panel would promote judicial economy and avoid the possibility of conflicting rulings."); *Gonzales v. Lucille Packard Children's Hosp.*, No. C 09-5539 JF, 2010 U.S. Dist. LEXIS 47939, at *6 (N.D. Cal. Apr. 14, 2010) ("a stay at this juncture will preserve judicial economy and facilitate uniform treatment of heparin-related cases by the MDL Panel"); *Sevel v. AOL Time Warner, Inc.*, 232 F. Supp. 2d 615, 618 (E.D. Va. 2002) (granting motion to stay determination of lead plaintiff pending transfer to MDL court to save "time, energy, and judicial resources"); *Moore v. Wyeth-Ayerst Labs.*, 236 F. Supp. 2d 509, 512 (D. Md. 2002) ("Because it furthers the goals of judicial economy and consistency, the motion to remand will be stayed until the Judicial Panel on Multidistrict Litigation can rule on Wyeth's motion to transfer."); *Rivers*, 980 F. Supp. at 1360-61 ("any efforts on behalf of this Court concerning case management will most likely have to be replicated by the judge that is assigned to handle the consolidated litigation"); *Bledsoe v. Janssen Pharmaceutica*, No. 4:05CV02330 ERW, 2006 U.S. Dist. LEXIS 5524, at *3-4 (E.D. Mo. Feb. 13, 2006) ("judicial economy weighs heavily in favor of granting the requested stay . . . [which] will . . . conserve judicial resources because only one court will need to make [pretrial] rulings"); *U.S. Bank, Nat'l Ass'n v. Royal Indem. Co.*, No. 3:02-CV-0853-P, 2002 WL 31114069, at *2 (N.D. Tex. Sept. 23, 2002) ("If the MDL motion is granted, all of the Court's time, energy,

535317.1 / 25-054
3

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1 │ and acquired knowledge regarding the action and its pretrial procedures will be wasted.").

2 │     In addition, granting a stay will avoid the risk of inconsistent rulings on early motions. *See*

3 │ *Camara v. Bayer Corp.*, No. C 09-06084 WHA, 2010 U.S. Dist. LEXIS 37521, at \*5-6 (N.D. Cal.

4 │ Mar. 9, 2010) ("In view of the MDL, however, [deciding motion to remand] would unnecessarily

5 │ duplicate work and could lead to inconsistent results."); *Litchfield Co., LLC v. BP, P.L.C.*, No.

6 │ 2:10-cv-01462, 2010 U.S. Dist. LEXIS 70513, at \*6 (D.S.C. July 14, 2010) (granting stay where

7 │ defendant would otherwise be "potentially forced to suffer conflicting rulings"); *Duke v. Rolls-*

8 │ *Royce Corp.*, No. 3:05CV538-W, 2007 U.S. Dist. LEXIS 18930, at \*5-6 (W.D.N.C. Feb. 28,

9 │ 2007) (granting stay "[i]n order to avoid the issuance of potentially contradictory rulings by the

10 │ Panel and this Court and to promote judicial efficiency"); *Am. Seafood, Inc. v. Magnolia*

11 │ *Processing, Inc.*, Nos. 92-1030, 92-1086, 1992 WL 102762, at \*2 (E.D. Pa. May 7, 1992)

12 │ (granting a stay because district court's determination of pretrial motions "may conflict with the

13 │ decisions of the Northern District of Mississippi which has in front of it similar motions. The

14 │ result is that the defendants may be forced to prosecute or defend similar motions twice and the

15 │ decisions of this Court and the Northern District may be in conflict.") (citing *Arthur-Magna, Inc.*

16 │ *v. Del-Val Fin. Corp.*, No. 90-4378, 1991 WL 13725 (D.N.J. Feb. 1, 1991)); *Krejce v. Merck &*

17 │ *Co.*, No. 4:08-CV-295 CAS, 2008 U.S. Dist. LEXIS 23509, at \*2 (E.D. Mo. Mar. 25, 2008)

18 │ (granting a stay "to conserve judicial resources and to prevent duplicative litigation and

19 │ inconsistent pretrial orders pending transfer"); *Allen v. Wyeth*, No. 08-4827, 2008 U.S. Dist.

20 │ LEXIS 102135, at \*3 (D. Minn. Dec. 17, 2008) (granting a stay because if the action is transferred

21 │ to an MDL court, that court would "be in the best position to rule" on plaintiffs' pre-trial motions

22 │ "in a way that promotes consistency between the parties in the MDL"). Indeed, the need to avoid

23 │ the risk of inconsistent rulings is one of the reasons why Congress established the multidistrict

24 │ litigation procedure. *See Ortenzio v. Eli Lilly & Co.*, No. 1:06CV179 (STAMP), 2007 U.S. Dist.

25 │ LEXIS 45316, at \*3-4 (N.D. W. Va. June 21, 2007) ("recogniz[ing] that one of the important

26 │ functions of a transfer to the JPML pursuant to 28 U.S.C. § 1407(a) is to 'further judicial economy

27 │ and to eliminate the potential for conflicting pretrial rulings'") (citation omitted); *In re Vioxx*

28 │ *Prods. Liab. Litig.*, 360 F. Supp. 2d 1352, 1354 (J.P.M.L. 2005) ("Centralization under [28 U.S.C.

535317.1 / 25-054      4

DEFENDANT DEPUY ORTHOPAEDICS, INC.'S NOTICE OF MOTION AND MOTION FOR STAY;
MEMORANDUM OF POINTS AND AUTHORITIES

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1  § 1407] is necessary in order to eliminate duplicative discovery, avoid inconsistent pretrial rulings,
2  and conserve the resources of the parties, their counsel and the judiciary.").

3      As noted above, plaintiffs' claims and legal theories overlap with at least 29 other lawsuits
4  that are subject to the pending motion for establishment of an MDL proceeding.  It makes no sense
5  for this Court to duplicate the efforts of the eventual MDL court in those cases, and doing so
6  would undermine the very purpose of an MDL proceeding.  Accordingly, there can be no question
7  that the interests of judicial economy and consistency of rulings strongly favor a stay here.

8      **II.    FAIRNESS CONSIDERATIONS ALSO FAVOR A STAY.**

9      Fairness considerations also favor a stay.  If plaintiffs were permitted to go forward in this
10  Court pending establishment of an MDL proceeding, DePuy would be required to litigate the same
11  complex issues in this Court that will likely be later litigated in an MDL court.  The burden of
12  duplicative litigation weighs heavily in favor of staying proceedings pending MDL transfer.
13  *Emerson v. Lincoln Elec. Holdings, Inc.*, No. 09-6004-CV-SJ-GAF, 2009 U.S. Dist. LEXIS 19906
14  (W. D. Mo. Mar. 12, 2009) ("the potential for 'duplicative motion practice and discovery
15  proceedings demonstrate that judicial economy and prejudice to the defendants weigh heavily in
16  favor of [a] stay.'") (quoting *Am. Seafood*, 1992 WL 102762, at *2); *Barnes v. Equinox Group,*
17  *Inc.*, No. C 10-03586 LB, 2010 U.S. Dist. LEXIS 138863, at *9-10 (N.D. Cal. Dec. 30, 2010)
18  ("the Court finds that the potential prejudice to the parties of expending unnecessary time and
19  costs weighs in favor of staying the case until the MDL Panel issues its decision"); *Arthur Magna*,
20  1991 WL 13725, at *1 (even where non-moving party claims that a stay will cause delay and
21  prejudice, "there are considerations of judicial economy and hardship to defendants that are
22  compelling enough to warrant such a delay").

23      Conversely, plaintiffs would suffer minimal – if any – prejudice from a slight delay in
24  prosecution of their case.  *See Emerson*, 2009 U.S. Dist. LEXIS 19906, at *2 ("potential prejudice
25  to Plaintiff is minimal" where duration of the stay – "until the JPML makes its final
26  determination" – "would be short"); *Carson v. CINAR Corp.*, No. 1:00CV626, 2001 U.S. Dist.
27  LEXIS 23143, at *3 (M.D.N.C. Jan. 22, 2001) ("the Court finds that a stay of the proceedings in
28  this matter . . . will not cause any unnecessary prejudice to the parties involved in this

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

1  proceeding"). Moreover, whatever short delay, if any, plaintiffs would suffer would be

2  outweighed by the benefits all the parties would receive from coordinated discovery and motion

3  practice in the likely MDL proceeding. *Nielsen v. Merck & Co.*, No. C07-00076 MJJ, 2007 U.S.

4  Dist. LEXIS 21250, at *6 (N.D. Cal. Mar. 15, 2007) (finding that "a balancing of the hardships to

5  the parties also favors a stay" where "Plaintiff does not establish any specific prejudice that would

6  be caused by deferring resolution of the remand question until the MDL court can address it

7  alongside similar cases" and "there would be a significant risk of inconsistent rulings"); *Brandt v.*

8  *BP, P.L.C.*, No. 2:10-cv-01460, 2010 U.S. Dist. LEXIS 70507, at *6 (D.S.C. July 14, 2010)

9  (explaining that "[a] delay of a few months . . . is . . . slight when compared to the hardship to the

10 defendants and the interests of judicial economy"); *Toppins v. 3M Co.*, No. 4:05CV01356 ERW,

11 2006 U.S. Dist. LEXIS 36, at *4 (E.D. Mo. Jan. 3, 2006) ("although Plaintiff might well be

12 subjected to some delay as a result of the issuance of a stay, that prejudice does not outweigh [ ]

13 judicial efficiency concerns"); *Lopez v. Tyson Foods, Inc.*, No. 8:06CV459, 2008 U.S. Dist.

14 LEXIS 106132, at *6 (D. Neb. Sept. 8, 2008) (granting stay because plaintiffs would not "suffer

15 any prejudice by a brief stay," but defendants, "in contrast," would be prejudiced by "additional

16 discovery or motion practice" that could "create duplicative and potentially inconsistent

17 obligations").

18     Simply put: the prejudice to DePuy without a stay, coupled with considerations of judicial

19 economy and the risk of inconsistent rulings, far outweighs the possibility of any minimal

20 prejudice to plaintiffs. *See, e.g., Allen*, 2008 U.S. Dist. LEXIS 102135, at *4 (granting a stay

21 because "any inconvenience to Plaintiffs [would] be minimal and [was] outweighed by the greater

22 interest in promoting consistency and predictability in the entire litigation"); *Walker v. Merck &*

23 *Co., Inc.*, No. 05-CV-360-DRH, 2005 WL 1565839, at *2 (S.D. Ill. June 22, 2005) ("While

24 Plaintiffs might well be subjected to some delay as a result of the issuance of a stay, that prejudice

25 does not outweigh the judicial economy interests").

26     For this reason, too, the motion should be granted.

27 ///

28 ///

535317.1 / 25-054
                                          6
DEFENDANT DEPUY ORTHOPAEDICS, INC.'S NOTICE OF MOTION AND MOTION FOR STAY;
MEMORANDUM OF POINTS AND AUTHORITIES

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788

## CONCLUSION

For the foregoing reasons, DePuy respectfully request that the Court stay all proceedings in this case pending a ruling by the MDL Panel regarding establishment of a Pinnacle ACS MDL proceeding.

DATED: April 8, 2011                    YUKEVICH CALFO & CAVANAUGH

By: _____
    Alexander G. Calfo
    Kelley S. Olah
    Attorneys for Defendant DEPUY
    ORTHOPAEDICS, INC.

535317.1 / 25-054
7
DEFENDANT DEPUY ORTHOPAEDICS, INC.'S NOTICE OF MOTION AND MOTION FOR STAY;
MEMORANDUM OF POINTS AND AUTHORITIES

# EXHIBIT 1

Dana B. Taschner (SBN 135494)
DANA B. TASCHNER
Lee A. Cirsch (SBN 227668)
THE LANIER LAW FIRM
2049 Century Park East, Suite 1940
Los Angeles, CA 90067
Phone: (310) 277-5100
Fax: (310) 277-5103

W. Mark Lanier
THE LANIER LAW FIRM
6810 F.M. 1960
Houston, TX 77069-3804
Phone: (713)-659-5200
Fax: (713) 659-2204

### BEFORE THE JUDICIAL PANEL
### ON MULTIDISTRICT LITIGATION

| | |
|---|---|
| IN RE: DEPUY ORTHOPAEDICS, INC. ) PINNACLE HIP IMPLANT PRODUCTS ) LIABILITY LITIGATION ) ) ) ) ) ) ) ) | MDL No. _____ <br><br> **BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR TRANSFER OF ACTIONS PURSUANT TO 28 U.S.C. § 1407** <br><br> **ORAL ARGUMENT REQUESTED** |

### INTRODUCTION AND SUMMARY OF ARGUMENT

On August 26, 2010, Defendant DePuy Orthopaedics, Inc. recalled the ASR XL Total Hip System and ASR Hip Resurfacing System ("ASR Device"). Shortly thereafter, numerous lawsuits were filed across the United States. Undersigned counsel filed a Petition with this Panel for coordination of all actions alleging injuries from the ASR Device. Following the November 7, 2010 hearing on the above Petition, the Panel transferred MDL 2197, *In re: DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability Litigation* to the Honorable David Katz in the Northern District of Ohio.

**Brief in Support of Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407**

- 1 -

EXHIBIT 1 - PAGE 008

Prior to Defendants manufacturing and marketing of the recalled ASR Device now subject to coordination by this Panel, Defendants manufactured and marketed the DePuy Pinnacle Acetabular Cup System ("Pinnacle Device"). Defendants manufactured approximately 150,000 Pinnacle Devices, exceeding the 93,000 ASR devices that have been implanted into patients. Both the recalled ASR Device and the DePuy Pinnacle Device were designed by Dr. Thomas Schmalzried, who is named as a defendant in numerous actions involving the ASR Device and Pinnacle Devices.

Since the August, 2010 recall of the ASR Device, over 1,300 adverse reports have been submitted to the FDA about the Pinnacle Device. Very recently, the courts have observed an escalation in the number of actions filed regarding the Pinnacle Device. Moving Party, Catherine Falvey, is among the many plaintiffs pursuing actions against DePuy and other defendants alleging an unacceptable high failure rate and other serious problems related to the Pinnacle Device. As DePuy manufactured a greater a number of Pinnacle Devices than ASR Devices, and marketed the Pinnacle Device over a longer period of time than the ASR Devices, it is likely that the number of actions filed related to the Pinnacle Device will substantially increase.

The transfer order regarding MDL 2197, *In re: DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability Litigation* specifically excludes actions related to DePuy's Pinnacle Devices. As such, Moving Party Catherine Falvey requests that this Panel either: (1) separately transfer Pinnacle Device claims to a transferee judge experienced in the management of complex product liability litigation, or (2) consolidate all ASR Device claims and Pinnacle Device claims into one coordinated action.

Moving Party Catherine Falvey's lawsuit, and the many actions that have been filed and that are anticipated regarding the ASR Device and Pinnacle Device, all seek redress for serious physical injuries, pain and suffering, debilitation and lack of mobility, and the need for revision surgery to replace Defendants' defective hip implant devices. The actions for ASR Devices and Pinnacle Devices allegedly also seek redress for damages caused by Defendants' alleged fraud and unfair business practices with respect to claims made in marketing materials regarding the

**Brief in Support of Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407**

-2-

**EXHIBIT 1 - PAGE 009**

superiority of their hip implant devices. Because the lawsuits are predicated on common issues of fact, they should be considered for consolidated and coordinated pretrial proceedings.

Pursuant to our obligation as the Moving Party in MDL 2197, *In re: DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability Litigation,* undersigned counsel brings the above matter to the attention of the Panel to request transfer of Pinnacle Device claims to a transferee judge capable of handling such complex products liability claims, or consolidation of Pinnacle Device claims with ASR Device claims.

If the Panel determines that transfer is appropriate in a coordinated proceeding separate from MDL 2197, Moving Party requests that the "Pinnacle Device" actions be transferred to the Southern District of Texas or Central District of California. If transferred to the Southern District of Texas, Plaintiff requests assignment to the Honorable Lee H. Rosenthal. If transferred to the Central District of California, Plaintiff requests assignment to the Honorable Dolly Gee. Both jurists have the judicial acumen and experience to manage proceedings of this scope and significance.

## FACTUAL BACKGROUND

The medical device at issue in these lawsuits is the Pinnacle Acetabular Cup System ("Pinnacle Device"). DePuy launched the Pinnacle Device in 2001. The Pinnacle Device was designed, developed, and sold for human hip joints damaged or diseased due to fracture, osteoarthritis, rheumatoid arthritis, and avascular necrosis. The Pinnacle Device is designed to be fastened to human bone with surgical screws. The Pinnacle Device was designed and sold to provide pain relief and consistent and smooth range of motion. The Pinnacle Device is made up of four components: the metal femoral stem is inserted inside the femur bone, the metal femoral head (or ball) connects to the top of the stem and then makes contact with a liner that is attached to the interior portion of the metal acetabulum cup (socket). The acetabulum cup is comprised of titanium metal on its outer shell. Either a plastic, ceramic, or cobalt-chromium metal liner is then placed on the inside of the acetabulum cup. The metal femoral head rotates within the plastic, ceramic, or metal liner, depending on which liner the surgeon selects based on the

**Brief in Support of Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407**

- 3 -

EXHIBIT 1 - PAGE 010

patient's needs. The cobalt-chromium metal liner is branded by Defendants as the "Ultamet."
The Pinnacle Device with an Ultamet liner is a "metal-on-metal" device due to the fact that both
articulating surfaces – the femoral head (ball) and acetabulum liner (socket) – are comprised of
cobalt-chromium metal.

Plaintiff's Complaint, a true and correct copy of which is attached hereto as **Exhibit A,**
alleges that the Pinnacle Device is defective and as a result has caused several harmful effects to
patients that have had the devices implanted. Specifically, the Pinnacle Device causes a high
percentage of patients to develop metallosis, biologic toxicity, and an early and high failure rate
due to the release of metal particles in the patient's surrounding tissue when the cobalt-
chromium metal formal head rotates within the cobalt-chromium metal acetabular liner giving
rise to severe cobalt-chromium metal toxicity in the patient's blood, tissues, and organs. These
particles accumulate in the patient's tissue surrounding the implant giving rise to metallosis,
pseudotumors, or other conditions. The formation of metallosis, pseudotumors, and infection
and inflammation causes severe pain and discomfort, death of surrounding tissue and bone loss,
and a lack of mobility.

The Complaint further alleges that the problems with the Pinnacle Device are similar to
the issues that gave rise to Defendants' recall of the ASR Device. Like the Pinnacle Device, the
ASR Device is also prone to early failure, and causes metallosis and cobalt toxicity resulting in
serious health problems and the need for subsequent revision surgery. As a result, in August
2010, Defendants, in acknowledging the high failure rate of the ASR Device, recalled more than
93,000 ASRs worldwide. It is anticipated that Defendants will at some point recall Pinnacle
Devices for the same reasons.

The Complaint also alleges that Defendants have known about these dangers for several
years, and have actively concealed that knowledge from physicians that purchase these devices
for implantation in their patients, as well as the public at large. Indeed, Plaintiff alleges that the
FDA has received more than 1,300 adverse reports regarding problems associated with or
attributed to the Pinnacle Device. However, Defendants not only continued to sell the Pinnacle
Device after receiving notice of a large number of F.D.A. complaints about the systems, but

**Brief in Support of Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407**

- 4 -

**EXHIBIT 1 - PAGE 011**

they continued to aggressively market them as safe and effective hip replacement systems
notwithstanding such notice. Plaintiff also alleges that many recipients of the Pinnacle Device
are suffering from elevated levels of chromium and cobalt, and that Defendants are aware that
certain recipients of the Pinnacle Device have significantly elevated levels of chromium and
cobalt in amounts many times higher than acceptable or recommended safety levels.

## ARGUMENT

### A.   STANDARD FOR TRANSFER AND COORDINATION

Multidistrict litigation is designed "to 'promote the just and efficient conduct' of 'civil
actions involving one or more common questions of fact' that are pending in different districts."
*In re. Phenylpropanolamine (PPA) Products Liability Litigation*, 460 F.3d 1217, 1229 (9th Cir.
2006), *quoting* 28 U.S.C. § 1407(a)). Upon a motion for transfer, the Judicial Panel on
Multidistrict Litigation "analyzes each group of cases in light of the statutory criteria and the
primary purposes of the MDL process to determine whether transfer is appropriate." *In re PDA
Products Liability Litigation*, 460 F.3d at 1230. It considers factors including "the progress of
discovery, docket conditions, familiarity of the transferee judge with the relevant issues, and the
size of the litigation." *Id.*, *citing* Multidistrict Litigation Manual § 5.16. On the specific issue of
whether to centralize litigation in a single district, the Panel considers the convenience of the
parties and witnesses, the number of related actions, and the complexity of common questions of
fact. *Cf. In re DaimlerChrysler Corp. Seat Belt Buckle Products Liability Litigation*, 217
F.Supp.2d 1376, 1377 (Judicial Panel on Multidistrict Litigation 2002) (considering these factors
and determining that centralization was not warranted).

Once a case goes into multidistrict litigation, "[c]oordination of so many parties and
claims requires that a district court be given broad discretion to structure a procedural framework
for moving the cases as a whole as well as individually, more so than in an action involving only
a few parties and a handful of claims." *In re PDA Products Liability Litigation*, 460 F.3d at
1231-32. This requires that the district court "be able to 'uncomplicate matters'" and that
counsel "'collaborate with the trial judge from the outset in fashioning workable programmatic

Brief in Support of Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407

- 5 -

EXHIBIT 1 - PAGE 012

procedures, and thereafter alert the court in a timely manner as operating experience points up infirmities warranting further judicial attention.'" *Id., quoting Massaro v. Chesley (In re San Juan Dupont Plaza Hotel Fire Litig.)*, 111 F.3d 220, 229 (1st Cir.1997).

## B.   TRANSFER AND COORDINATION IS APPROPRIATE BECAUSE THE DEPUY PINNACLE DEVICE CASES RAISE COMMON QUESTIONS OF FACT.

The defective nature of the Pinnacle Device has and will give rise to numerous "civil actions involving one or more common questions of fact." 28 U.S.C. § 1407(a). Among the common questions of fact are:

1)   Whether and to what extent the Pinnacle Device has caused, or will cause, harmful effects in patients that received the device including but not limited to physical injury, pain and suffering, swelling, severe inflammation of surrounding tissue and bone, metallosis, toxic levels of cobalt and chromium metal, an inability to walk and other lack of mobility, and the need for revision surgery to remove the defective Pinnacle Device with the attendant risks of complications and death from surgery;

2)   When Defendants first learned of the connection between the Pinnacle Device and the foregoing harmful effects caused by the devices;

3)   Whether, and for how long, Defendants concealed this knowledge from physicians that purchased the devices for surgical implantation in their patients and the public;

4)   Whether Defendants defectively designed and/or manufactured the Pinnacle Device;

5)   Whether Defendants failed to provide adequate warnings and instruction concerning the Pinnacle Device;

6)   Whether Defendants were negligent in their design and/or manufacture of the Pinnacle Device;

**Brief in Support of Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407**

- 6 -

EXHIBIT 1 - PAGE 013

7)    Whether Defendants engaged in fraudulent and illegal marketing practices,
      including but not limited to making unsubstantiated claims regarding the
      superiority of the Pinnacle Device as a hip replacement system in order to market
      the Pinnacle Device to physicians and the public; and

8)    The nature and extent of damages suffered by Plaintiffs as a result of the Pinnacle
      Device.

Separate, unconsolidated pretrial proceedings in the cases that have been and will be filed
would greatly increase the costs of this litigation for all parties, waste judicial resources, and
create a significant risk of inconsistent rulings on these common questions of fact.

## C.   THE COORDINATED PINNACLE DEVICE CASE SHOULD BE
##      TRANSFERRED TO THE SOUTHERN DISTRICT OF TEXAS OR
##      CENTRAL DISTRICT OF CALIFORNIA

Although cases are and will be pending in numerous Districts, the most expedient and
judicially economical venue for all parties is likely to be the Southern District of Texas before
the Honorable Lee H. Rosenthal. Judge Rosenthal chairs the Judicial Conference Committee on
Rules of Practice and Procedure, to which she was appointed in 2007 by Chief Justice John G.
Roberts, Jr. Judge Rosenthal's committee supervises the rule-making process in the federal
courts and oversees and coordinates the work of the Advisory Committees on the Federal Rules
of Evidence and of Civil, Criminal, Bankruptcy and Appellate Procedure. Prior to 2007,
Rosenthal was Chair of the Judicial Conference Advisory Committee on the Federal Rules of
Civil Procedure, appointed by former Chief Justice William Rehnquist in 1996. Judge Rosenthal
is a skilled jurist experienced in presiding over complex litigation, and thus would be capable of
effectively managing this litigation. In addition, the Southern District of Texas would be a
convenient forum for all parties given that it is among the most centrally located Districts in the
United States. Notably, Judge Rosenthal was mentioned as an appropriate transferee judge in
MDL 2197 In re DePuy ASR Hip Implant Litigation Proceedings.

**Brief in Support of Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407**

EXHIBIT 1 - PAGE 014

In MDL 2197, *In re: DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability Litigation*, various parties requested transfer to the Honorable Dolly Gee of the Central District of California as the Central District of California has a significant number of claimants located within the District. And the first Central District of California action alleging products liability claims against Defendants was assigned to the Honorable Dolly Gee. In addition, the Central District of California is where primary defendants are located, and where a significant client population is based.

Pursuant to the obligations as Moving Party in the MDL 2197, *In re: DePuy Orthopaedics, Inc., ASR Hip Implant Products Liability Litigation*, undersigned counsel brings the above matter to the attention of the Panel to request transfer of Pinnacle Device claims to a transferee judge capable of handling such complex products liability claims, or consolidation of Pinnacle Device claims with ASR Device claims.

DATED: March 23, 2011

Dana B. Taschner

**Brief in Support of Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407**

EXHIBIT 1 - PAGE 015

1

**PROOF OF SERVICE**

2

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3

At the time of service, I was over 18 years of age and **not a party to this action.** I am employed in the County of Los Angeles, State of California. My business address is 355 South Grand Avenue, Fifteenth Floor, Los Angeles, California 90071-1560.

4

5

On April 8, 2011, I served true copies of the following document(s) described as **DEFENDANT DEPUY ORTHOPAEDICS, INC.'S NOTICE OF MOTION AND MOTION FOR STAY; MEMORANDUM OF POINTS AND AUTHORITIES** on the interested parties in this action as follows:

6

7

8

Kenneth M. Seeger                           Attorneys for Plaintiffs
Brian J. Devine
SEEGER • SALVAS LLP

9

455 Market Street, Suite 1530              T:        (415) 981-9260
San Francisco, CA 94105                      F:        (415) 981-9266

10

11

**BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with Yukevich Calfo & Cavanaugh's practice for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

12

13

14

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

15

16

Executed on April 8, 2011, at Los Angeles, California.

17

18

19

Deanna Castellanos

20

21

22

23

24

25

26

27

28

535271.1 / 25-055

DEFENDANT DEPUY ORTHOPAEDICS, INC.'S NOTICE OF MOTION AND MOTION FOR STAY;

**EXHIBIT 1 - PAGE 016**

1  **PROOF OF SERVICE**

2  **STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

3       At the time of service, I was over 18 years of age and **not a party to this action.** I am
4  employed in the County of Los Angeles, State of California. My business address is 355 South
   Grand Avenue, Fifteenth Floor, Los Angeles, California 90071-1560.

5       On April 8, 2011, I served true copies of the following document(s) described as
   **DEFENDANT DEPUY ORTHOPAEDICS, INC.'S NOTICE OF MOTION AND MOTION**
6  **FOR STAY; MEMORANDUM OF POINTS AND AUTHORITIES** on the interested parties
   in this action as follows:

7
   Kenneth M. Seeger                          Attorneys for Plaintiffs
8  Brian J. Devine
   SEEGER • SALVAS LLP
9  455 Market Street, Suite 1530              T:     (415) 981-9260
   San Francisco, CA 94105                    F:     (415) 981-9266

10

11 **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons
   at the addresses listed in the Service List and placed the envelope for collection and mailing,
12 following our ordinary business practices. I am readily familiar with Yukevich Calfo &
   Cavanaugh's practice for collecting and processing correspondence for mailing. On the same day
13 that the correspondence is placed for collection and mailing, it is deposited in the ordinary course
   of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

14
       I declare under penalty of perjury under the laws of the United States of America that the
15 foregoing is true and correct and that I am employed in the office of a member of the bar of this
   Court at whose direction the service was made.

16
       Executed on April 8, 2011, at Los Angeles, California.

17

18

19                                         Deanna Castellanos

20

21

22

23

24

25

26

27

28

535271.1 / 25-055

DEFENDANT DEPUY ORTHOPAEDICS, INC.'S NOTICE OF MOTION AND MOTION FOR STAY;
MEMORANDUM OF POINTS AND AUTHORITIES

YUKEVICH CALFO & CAVANAUGH
355 S. GRAND AVENUE, 15TH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 362-7777
FACSIMILE (213) 362-7788